CARAWAY, J.
|2Ponald Aaron was charged by grand jury indictment with manslaughter in violation of La. R.S. 14:31. By a 10-2 vote, a jury convicted him of negligent homicide. Prior to trial, the state moved to impose Aaron’s sentence under La.C.Cr.P. art. 893.3, a firearm enhancement statute. Specifically, the state alleged that Aaron actually discharged a firearm during the commission of manslaughter. The trial court imposed a five-year hard labor sentence for the negligent homicide conviction with enhancement under La.C.Cr.P. art. 893.3. Aaron appeals, raising five assignments of error. We affirm the conviction, vacate the sentence, and x-emand for resen-tencing.

Facts

At 1:30 p.m. on April 23, 2005, Aaron called Caddo Pailsh 911 and reported that he had shot a man near his Shreveport home. Shreveport Police Department (SPD) Cox-poral Diana Coleman, the first officer to respond to |sthe scene, saw two cars parked, nose to tail, off of the road. The cars wei'e stopped about 200 feet from the home whei'e Aaron resides with his father and approximately 100 feet down the road from the driveway of the home. The cars were slightly off the road, partly on Aaron’s propei'ty. The home is the last residence located on a narrow dead end residential sti'eet, some distance from the neighboring residences.
The lead car was a Nissan Maxima in which Ronald Jamison was still seated when police aiTived. Jamison had been fatally shot seven times. The windows of both front doors in the Maxima had been shattei-ed. Jamison’s right hand was resting in his lap, holding a beer bottle wrapped in a brown paper bag; he had nothing in his left hand. His car, although running, was in neutral; his light foot was on the accelerator. No weapons were found in Jamison’s car, although he had two serewdilvers between his seat and the console.
The other car at the scene had been driven by Aaron. After the shooting, Aaron left his handgun on the front passenger seat of his vehicle, a Honda Accord. Photos show that the shift knob on the gear shift lever of Aaron’s vehicle was missing.
When the officer arrived, Aaron was standing beside the cars on the street with his father. Aaron, formerly a police offi- *369 eer, a martial arts | instructor and world’s super lightweight kickboxing champion, told Corporal Coleman that he was the person who shot Jamison. Coleman said:
He [Aaron] stated that he had come home for lunch and that there was a car in his driveway and that he followed the car to see, to get the tag number off of the car, and that he stopped behind the — no—that he had followed the car to get the tag number off the car, and he asked the guy why he was in his driveway, why was he here. And he said that the guy told him that T can’t park, I can’t drive down this street?’ And he said that they had, you know, some type of verbal jargon there. He said the guy appeared to reach for something,' and the guy told him that he was going to kill him, and so he stated that he shot the guy.
Aaron also stated that he had been concerned that Jamison may have broken into his house and that he had been unable to put his car into reverse during his encounter with Jamison due to the faulty gear shift.
After Jamison was transported from the scene, SPD Detective Shawn Parker arrived. Detective Parker and Aaron’s father walked around the outside of the defendant’s home to check for signs of burglary; they found none. The detective saw that Aaron had several homemade dog cages in the backyard with dogs in them; the defendant raised and sold pit bulls. A chain-type dog collar was found hanging from the rear view mirror of Ja-mison’s vehicle; Aaron had a similar chain-type dog collar in his vehicle as well.[1] 1 sSPD had responded to four complaints of burglary at the Aaron residence in the years 1991 (two calls), 1994 and 2001.
SPD Sergeant Amy Muller and Corporal David Walls, crime scene investigators, also responded to the scene. Sergeant Muller and Corporal Walls took numerous photos of the scene including the scene as a whole, Aaron’s house and property, and detailed photos of the items .of interest. The photos clearly showed the position and nature of the bullet holes in Jamison’s car. One of these holes grazed the edge of the driver’s side windowsill in a way that makes the angle of the shot clear; the shot passed at a shallow angle from left to right. Sergeant Muller determined that the path of one bullet that traveled through the. driver’s seat was different from three other bullet paths she was able to measure; that bullet appears to have been fired from nearer the front of the Maxima than the others, which were fired from the side. Police found five spent shell casings on the ground outside the cars and three spent shell casings inside the defendant’s car. Measurements showed that Jamison’s driver’s side window was at least partially raised when it was shot out. Sergeant Muller examined the window mechanism and opined that Jamison’s window had been down about half way.
During the investigation, Sergeant Muller parked the Accord next to the Maxima in an effort to determine the position of the cars at the time of | r,the shooting, and Muller took photos of that recreation. The photos show that the cars must have been parked nearly side by side when at least three of the shots were fired.
After the initial investigation, police learned that Aaron was not alone in his car at the time of the shooting and that his *370 girlfriend, Jamie McWilliams, was with him. During the search of Aaron’s car, police found “some Bossier court narcotic stuff’ with McWilliams’s name on it. About a week after the shooting, McWil-liams agreed to meet with police and give a statement.
Aaron appeared for testimony before a Caddo Parish grand jury, which later indicted him for manslaughter. Without objection and by apparent agreement, his grand jury testimony was presented by the state in the trial of the case-and read to the jury. In his grand jury testimony, Aaron testified that on the day of the shooting, he and his girlfriend were driving home to meet Aaron’s father for lunch. When they arrived at home, Aaron saw Jamison’s Maxima parked in the circular driveway in front of his home. Neither Aaron nor McWilliams recognized the vehicle. Aaron stated that there had been some suspicious vehicles in the area the night before.
As Aaron approached his home, he did not see anyone moving around the yard, entering or exiting the Maxima. Aaron pulled his car into the 17circular driveway from the other side, approaching Jamison’s car from the front. Neither he nor McWilliams recognized Jamison.
At that point, Jamison backed up and began to leave. Aaron, suspicious of Jami-son’s actions, decided to follow him as he backed out of the driveway in an effort to get the license plate number of Jamison’s vehicle. Once Jamison had backed into the street with Aaron following, Jamison waved for Aaron to exit the driveway and proceed down the street ahead of him. After Aaron waved back for Jamison to proceed, Jamison began to drive away down the street with Aaron’s vehicle following.
Then, abruptly, Jamison pulled to the side of the road and stopped, rolling down his window. Aaron pulled up beside Jami-son slightly to the front of Jamison’s car with the vehicles 3 to 5 feet apart. Aaron testified that he placed his car in park. He rolled down his passenger side window and asked Jamison, “What’s happening man? Are you lost or something?” According to Aaron, Jamison replied, “What, mfer? I can’t drive down the street,” in a very aggressive and agitated manner. Aaron replied that Jamison was not driving down the street, but was parked in Aaron’s driveway. Aaron testified that when he “said this,” Jamison:
got belligerent beyond explanation. He was cursing me, and I didn’t even hear all of what he said, but the last statement he made to me was ‘I’ll kill you,’ and I did hear this.
| sUpon this exchange, Aaron began trying to get his car into gear but could not get the gear shift to work, so he retrieved his loaded pistol in case Jamison tried to do something. Aaron said that Jamison said, “White boy, I’ll kill you,” and then began to open his door and bent forward in his seat as if he were reaching down for something. Aaron said that he had “no question in my mind” but that Jamison had a weapon. However, Aaron admitted that he could not see Jamison’s hands or arms so as to even identify with which arm he was reaching. Aaron interpreted that Jamison was reaching for a weapon because his body dipped down.
At that point, before Jamison’s hands were raised, Aaron began firing at Jami-son. Aaron fired out the window of his car while reaching over McWilliams, pinning her down against the seat. He said that neither of the cars moved during the shooting and that all the shots were fired from inside his car.
When the shooting stopped, Aaron got out of his car, walked around Jamison’s car *371 and opened Jamison’s driver’s side door wider to look inside. Aaron said that Ja-mison’s engine was racing. Aaron got back into his car and returned to his house. Aaron then entered his house to make sure there were no intruders inside. After finding no problem with the house, he called |n911. In the call, he reported that Jamison had threatened to kill him. Aaron drove back to where Jamison’s car was parked to wait for police. ■ ■ :.
Aaron was charged by grand jury indictment with manslaughter, and the state later filed a notice that it was seeking a firearm enhancement under La.C.Cr.P. art. 893.3(E)(1)(a) for manslaughter. When the case went to trial, the jury heard all of the above evidence, including Aaron’s testimony before the grand jury, and viewed many photos of the crime scene. A lengthy videotape filmed from the investigating officer’s patrol car was played for the jury. On the tape, there are recorded statements of Aaron, including a phone call he made to McWilliams while he was detained inside the patrol car.
Additionally, the jury heard expert testimony from defense witness Corporal Rodney Horton, a training officer at the Shreveport Regional Police Training Academy, regarding the dynamics of deadly force situations and the training that police officers receive to manage those situations. Among many other things, Corporal Horton explained that once a suspect “has the ... drop on you,” it is impossible to draw and fire a weapon before the suspect can shoot you. With his grand jury testimony having been placed in evidence, Aaron did not testify in his own defense. Although available 110and present at the courthouse under subpoena, McWilliams was not called to testify.
After hearing all of the evidence, the jury deliberated and returned a verdict of negligent homicide by a vote of 10-2. The jury also found that the defendant “used or discharged” a firearm during the commission of the crime. The court denied Aaron’s motions for post-verdict judgment of acquittal and objection to the firearm enhancement of the sentence. The court sentenced Aaron to serve five years at hard labor, all without benefit of parole, probation or suspension of sentence. The defendant filed a detailed motion to reconsider sentence which the court denied.

Discussion

I.
Aaron argues that there was no evidence to support the verdict of criminal negligence. Additionally, he claims the state failed to disprove that he acted in self-defense because the state did not exclude the reasonable hypothesis that Aaron reasonably believed the shooting was necessary.
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); State v. Tate, 01-1658 (La.5/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004); State v. Carter, 42,894 (La.App.2d Cir.1/9/08), 974 So.2d 181, writ denied, 08-0499 (La.11/14/08), 996 So.2d 1086. This standard, now legislatively embodied in La.C.Cr.P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, 05-0477 (La.2/22/06), 922 So.2d 517; State v. Dotie, 43,819 (La.App.2d Cir.1/14/09), 1 So.3d 833, writ denied, 09-0310 (La.11/6/09), 21 So.3d 297. The appellate court does not assess the *372 credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part. State v. Eason, 43,788 (La.App.2d Cir.2/25/09), 3 So.3d 685, writ denied, 09-0725 (La.12/11/09), 23 So.3d 913; State v. Hill, 42,025 (La.App.2d Cir.5/9/07), 956 So.2d 758, writ denied, 07-1209 (La.12/14/07), 970 So.2d 529. See also, State v. Bowie, 43,374 (La.App.2d Cir.9/24/08), 997 So.2d 36, writ denied in State v. Jackson, 08-2639 (La.5/22/09), 9 So.3d 141 (same deference applies to bench trial).
112The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Speed, 43,786 (La.App.2d Cir.1/14/09), 2 So.3d 582, writ denied, 09-0372 (La.11/6/09), 21 So.3d 299; State v. Parker, 42,311 (La.App.2d Cir.8/15/07), 963 So.2d 497, writ denied, 07-2053 (La.3/7/08), 977 So.2d 896. See also La. R.S. 15:438.
In relevant part, La. R.S. 14:31 defines manslaughter as follows:
A. Manslaughter is:
(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender’s blood had actually cooled, or that an average person’s blood would have cooled, at the time the offense was committed.
Heat of passion manslaughter requires proof of specific intent. State v. Harris, 00-3459 (La.2/26/02) 812 So.2d 612; State v. Humphrey, 412 So.2d 507 (La.1981).
Likewise, La. R.S. 14:32 provides that negligent homicide is the killing of a human being by criminal negligence. Criminal negligence is defined in La. R.S. 14:12 as follows:
Criminal negligence exists when, although neither specific nor general criminal intent is present, there is such disregard of the interest of others that the offender’s conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances.
In 2005,[2] the relevant portions of La. R.S. 14:20 provided:
A homicide is justifiable:
(1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.
(2) When committed for the purpose of preventing a violent or forcible felony involving danger to life or of great bodily harm by one who reasonably believes that such an offense is about to be com *373 mitted and that such action is necessary for its prevention. The circumstances must be sufficient to excite the fear of a reasonable person that there would be serious danger to his own life or person if he attempted to prevent the felony without the killing.[3]
 114Factors to consider in determining whether a defendant had a reasonable belief that the killing was necessary-are the excitement and confusion of the situation, the possibility of using force or violence short of killing, and the defendant’s knowledge of the assailant’s bad character. State v. Wright, 42,956 (La.App.2d Cir.3/5/08), 978 So.2d 1062, writ denied, 08-0819, 994 So.2d 532 (La.10/31/08). Although there is no qualified duty to retreat, the possibility of escape is a factor to consider in determining whether a defendant had a reasonable belief that the use of deadly force was necessary to avoid the danger. Id.
La. R.S. 14:21 provides:
A person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict.
When self-defense is raised as an issue by the defendant, the state has the burden of proving, beyond a reasonable doubt, that the homicide was not perpetrated in self-defense. State ex rel. D.P.B., 02-1742 (La.05/20/03), 846 So.2d 753; State v. Garner, 39,731 (La.App.2d Cir.9/8/05), 913 So.2d 874, writ denied, 05-2567 (La.5/26/06), 930 So.2d 19; State v. Gaddis, 36,661 (La.App.2d Cir. 03/14/03), 839 So.2d 1258, writ denied, 03-1275 (La.05/14/04), 872 So.2d 519, cert. denied, 544 U.S. 926, 125 S.Ct. 1649, 161 L.Ed.2d 487 (2005).
When the defendant challenges the sufficiency of the evidence in such a case, the question becomes whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the homicide was not committed in self-defense. State ex rel, D.P.B., supra.
Jamison’s presence in the driveway of the Aaron home was suspicious and without permission. The two men’s confrontation that then occurred as Jamison was exiting down the street is described by Aaron as escalating' to a point where he reasonably believed that he was in imminent danger of losing his life or receiving great bodily harm from Jamison. Aaron’s testimony therefore asserted self-defense for his and McWilliams’s protection. Moreover, Aaron. asserts that he did not have a specific intent to kill Jamison or cause him great bodily harm while acting with sudden passion or heat of blood.
The charge to the jury included the law as reviewed above regarding justifiable homicide and self-defense (La. R.S. 14:20), manslaughter (La. R.S. 14:31), and negligent homicide (La. R.S. 14:32 and 14:12). Therefore, before we address the argument raised by Aaron regarding the propriety of h,;the responsive verdict[4] of neg *374 ligent homicide and the lack of sufficient evidence for proof of negligent homicide, we will first review whether the state met its burden of proving beyond a reasonable doubt that the homicide was not perpetrated in self-defense.
Aside from Aaron’s testimony, the state did present evidence reflecting circumstantially on what transpired between the men. Jamison was driving away from the Aaron residence on a public street. He was unarmed. He was shot seven times while still sitting in his vehicle with a beer bottle between his legs and his ear window only partially down. There are strong circumstantial inferences that the jury was entitled to draw from these facts, which conflict with Aaron’s claim of self-defense. Thus, Aaron’s argument that his testimony was “the only source of information regarding what transpired” is incorrect.
Additionally, there were two statements made in Aaron’s testimony which revealed his state of mind and militated against a finding that he had a reasonable belief that he was in imminent danger. Aaron did not see any movement by Jamison or any other person outside of Jamison’s vehicle as Aaron approached his home. Therefore, the issue of whether a burglary or other crime had occurred was very much in doubt. Aaron said, “I didn’t know if I was talking to a newspaper guy” as he first approached Jamison. [^Additionally, when Aaron was asked in his testimony before the grand jury what it was that caused him to fire the first shot at Jami-son, Aaron volunteered that Jamison’s verbal “threats certainly weren’t enough.”
The event that caused Aaron to rapidly shoot eight times at Jamison was a sudden movement that Jamison made inside his car. Aaron stated that immediately preceding the shooting he felt he could not get his car from park into gear and drive away from Jamison’s threatening behavior. Therefore, Aaron picked up his loaded semiautomatic handgun. There was no need to engage a shell in the gun’s chamber, and Aaron extended the gun over across McWilliams by the doorframe and open window, reaching to shoot as Jami-son’s fatal movement occurred.
Jamison’s movement as described by Aaron included his opening the car door. However, the door was just slightly opened and always remained as a barrier between the two men. Jamison never began any movement turning his body to exit the vehicle. His critical movement was described by Aaron as follows:
He opened the door and reached front and left, as if he were reaching between the seat and the door or next to the seat or under the front left portion of the seat, but that’s the way he made his motion.
* * * * * *
Because he dipped his whole body under as if he were reaching underneath the seat. I still didn’t do anything until he came up so abruptly like he did.
11sOther than this description, Aaron never reported that one of Jamison’s arms or his hand appeared or extended to be seen above the door. Any arm motion would have necessarily been hindered and obstructed by the door, the steering wheel and the partially closed window. Jami-son’s body was found seated, with his legs still below the steering wheel. Despite any abruptness of Jamison’s motion, there was no demonstration by Jamison indicating that a weapon was drawn and was beginning to be extended around the steering wheel and above the window or that his body was suddenly turning with the *375 door swinging open.[5] Those movements had not begun, and yet Aaron clearly had his gun drawn and pointed at Jamison’s head. Aaron did not testify that he gave any advance warning before shooting, not even by the sound of chambering a shell into his gun.
From the above evidence, the jury could conclude that Aaron was not presented with an imminent danger so as to justify a reasonable belief that the killing of Jami-son was necessary to save himself from losing his life or receiving great bodily harm. Aaron had perceived what he believed to be a threat posed by Jamison and had initiated his defense by aiming his gun at Jamison. Jamison did not have “the drop” on Aaron. Aaron had the drop on Jamison and fired at a time when Jamison had not begun a threatening action 113from the confines of his car in which he was limited from posing a deadly threat.
The jury’s weighing of the circumstantial facts regarding the shooting and Aaron’s offered explanation of self-defense also involved a significant credibility issue. The issue concerned McWilliams, who, as revealed by the police dash-cam video, was not present at the crime scene when officers arrived. Inexplicably, she was never reported by Aaron as a witness to the shooting. Aaron gave multiple reports of how the shooting occurred first to Corporal Coleman and later in a recorded statement while sitting in the patrol car. He never revealed McWilliams as a witness who could verify his account of the shooting. When asked why he did not report McWilliams as a witness, Aaron said that he assumed she was present when the officers arrived and was speaking to the officers at the scene on her own. Although he testified that he did not know about McWilliams’ probation for a prior criminal offense, he continued his nondisclosure of her presence in the vehicle during his incarceration the next two days before posting bond.
Moreover, the issue of the nondiselosuré of McWilliams and Aaron’s credibility became thoroughly clouded by the audiotape of a cell phone call made by Aaron at the crime scene while he sat in the patrol car. Aaron is heard on the audiotape, initiating the phone call saying:
[¡>nl just shot someone. You hear me? Hey. Jamie? Hey. Hello? Hey, can you hear me? I just shot someone, Jamie, outside the house. Where are you? You’re at the kennel? ... Is the house locked?
In Aaron’s grand jury testimony, he was not confronted with this phone call which clearly contradicts various aspects of his testimony. The state’s assistant district attorney did cross-examine Aaron regarding his nondisclosure of McWilliams and whether she was actually present in the vehicle at the time of the shooting. Aaron persisted in his statement that McWilliams was in the car and a witness to the shooting.
With the evidence by which the jury could conclude that the homicide was not perpetrated in self-defense, the jury could also conclude that negligent homicide occurred. As shown by the elements of the two crimes of manslaughter and negligent homicide, the former is a specific intent crime committed in the heat of passion, while the latter involves a “requisite ‘negative’ mental state of gross disregard for the consequences of ... actions and for the interests of others.” State v. Beason, 26,725 (La.App.2d Cir.4/7/95), 653 *376 So.2d 1274, 1280, writ denied, 95-1388 (La.10/27/95), 661 So.2d 1359. The jury concluded that Jamison never posed a deadly threat to Aaron and likewise concluded that Aaron’s action was a gross disregard for the interests of others. Although denied by Aaron, there is circumstantial [¾1 evidence indicating that Aaron responded to Jamison’s belligerence with anger and in heat of passion. Nevertheless, the jury rejected manslaughter as its verdict, finding instead that Aaron’s conduct amounted “to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under the circumstances.” The jury was charged with the definition of both crimes,[6] and we find that the evidence was sufficient to support the verdict of negligent homicide.
II.
Aaron next argues that the firearm enhancement of his sentence was invalid because the notice given by the state only provided for its application to the crime of manslaughter, not negligent homicide.
La.C.Cr.P. art. 893.1 provides:
A.If the district attorney intends to move for imposition of sentence under the provisions of Article 893.3, he shall file a motion within a reasonable period of time prior to commencement of trial of the felony or specifically enumerated misdemeanor in which the firearm was used.
B.The motion shall contain a plain, concise, and definite written statement of the essential facts constituting the basis for the motion and shall specify the provisions of this Chapter under which the district attorney intends to proceed.
The state gave notice to Aaron that it was pursuing the enhancement under La. C.Cr.P. art. 893.3(E)(1)(a) which provides:
12pNotwithstanding any other provision of law to the contrary, if the defendant commits a felony with a firearm as provided for in this Article, and the crime is considered a violent felony as defined in this Paragraph, the court shall impose a minimum term of imprisonment of ten years. In addition, if the firearm is discharged during the commission of such a violent felony, the court shall impose a minimum term of imprisonment of twenty years.
A violent felony as defined in this provision includes second degree sexual battery, aggravated burglary, carjacking, armed robbery, second degree kidnaping, manslaughter, or forcible rape. La.C.Cr.P. art. 893.3(E)(1)(b).
The state’s written notice provided the factual basis for the enhancement as follows:
The State so notifies the defendant(s) based upon the following information: The defendant committed a violent felony, namely manslaughter, where he actually discharged a firearm during the commission of the offense. Refer to *377 Art. 893.1(E)l(a) for the specific provision upon which the State is relying.
After trial, but prior to sentencing, Aaron filed a motion in opposition to the state’s notice of intent to seek firearm enhancement. Prior to sentencing, the trial court denied Aaron’s motion with defense objection.
Of course, Aaron was not convicted of any of the listed crimes of violence, which include the charged offense of manslaughter. Negligent | ^homicide is not listed as a crime of violence. Accordingly Article 893.3(E)(1)(a) could not apply to enhance Aaron’s sentence. Although arguably other subsections of La.C.Cr.P. art. 893.3 apply to a conviction of negligent homicide, we find that the mandatory provisions of La.C.Cr.P. Art. 893.1 required the state to notify Aaron of its intent to proceed under the applicable provision of the statute and to give the factual basis therefor. Because no such notice was given to Aaron, we find that the enhanced sentence was erroneously imposed. Accordingly, we vacate the enhanced sentence and remand for resentencing.
III.
Aaron argues that the jury could not fully determine the circumstances of this case without viewing in person the crime scene.
Before trial, Aaron filed a written motion to permit the jury to view the crime scene which the trial court denied. Counsel for the defense lodged an objection to the ruling.
La.C.Cr.P. art. 762 provides, in part:
Sessions of court shall be held at the parish courthouse and, if there is more than one courthouse in a parish, sessions may be held at any such courthouse, or sessions may be held at places within the parish other than the courthouse or courthouses in the discretion of the court:
(2) To allow the jury or judge to view the place where the crime or any material part thereof is alleged to have | ¡^occurred, or to view an object which is admissible in evidence but which is difficult to produce in court.' At this view, the court shall not permit the taking of evidence except in connection with the place or object....
A ruling on a motion to have the jury view the scene of the crime is within the sound discretion of the trial court, and the ruling will not be disturbed on appeal in the absence of an abuse of discretion. See, e.g., State v. Gallow, 338 So.2d 920 (La.1976).
In this case, the trial court clearly did not abuse its discretion. The jury saw, among other things, Google Earth views of Aaron’s home and its location relative to nearby landmarks, at least a dozen photos of the defendant’s home and the surrounding area, and a carefully prepared, measured diagram of the scene itself. The jury also viewed the videotape taken from the police car showing Jamison’s car at the site of the shooting and, in the background, the Aaron home. The jury was clearly aware that the crime happened in a secluded area where there was little traffic and no apparent -reason for Jamison to be on the Aaron property. Thus, taking- the jury to the crime scene would have been cumulative and unnecessary. This assignment of error is without merit.
TV.
| gsAaron argues that the court erred when it refused to allow the jury to hear that Jamison had 'outstanding warrants for his arrest;
*378 After the state rested its ease, Aaron moved the court to allow Jamison’s “bench warrants into evidence” to assist in his defense. The defense argued that the evidence would be relevant to show why Ja-mison would have been so concerned “with anybody taking his tag down” and would have explained why Jamison “jerked over” to the side of the road and stopped his car abruptly. Specifically the defense argued twice that the evidence was not character evidence but was “evidence to support Mr. Aaron’s contention that this man acted evasive when he tried to get his license.” Aaron’s counsel conceded that he had no case law to support this argument. Determining that it had no authority to admit the evidence, the trial court denied Aaron’s request.
Calls on relevancy and admissibility of evidence are properly within the discretion of the trial judge, whose determinations in these areas should not be overturned absent a clear abuse of discretion. State v. Tauzin, 38,436 (La.App.2d Cir.8/18/04), 880 So.2d 157. Even relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. La. C.E. art. 401.
On appeal, Aaron argues that the evidence was relevant to explain Jamison’s actions at the time of the crime and was not offered as character evidence but merely to show Jamison’s state of mind and behavior. At trial, however, no evidence showed that Jamison was aware of either the warrants or Aaron’s claimed attempt to obtain his license number. Thus, facts showing Jamison’s state of mind regarding the warrants were never put at issue. With no such evidence before the jury, the admission of the warrants would have been extraneous. Moreover, any arguable relevance of the evidence to the victim’s actions was far outweighed by the inherent prejudice contained in the arrest warrants that tended to portray the victim as a bad person and overwhelm the actual evidence of his conduct on the day in question. This assignment of error has no merit.

Decree

For the foregoing reasons, Aaron’s conviction for negligent homicide is affirmed. His sentence is vacated and the case is remanded to the trial court for resentenc-ing.
AFFIRMED IN PART; REVERSED IN PART; REMANDED.
APPLICATION FOR REHEARING
Before BROWN, WILLIAMS, STEWART, CARAWAY and MOORE, JJ.
[] Rehearing denied.

. Jamison’s mother said that the victim did not own any dogs and that she did not recognize the dog collar as an item that belonged to her son; she explained that the chain was not on his rearview mirror when he left home on the morning of the shooting.

. In 2006, La. R.S. 14:20 was amended substantially.

. Because there was no evidence that Jami-son was attempting to commit a burglary, robbery or unlawful entry at the moment of the shooting, La. R.S. 14:20(3) and (4) do not apply.

. La.C.Cr.P. art. 814 provides, in relevant part:
A. The only responsive verdicts which may be rendered when the indictment charges the following offenses are:
[[Image here]]
5.Manslaughter:
Guilty.
Guilty of negligent homicide.
Not guilty.

. Aaron's recorded description on the videotape differed from his grand jury testimony in that it did not report Jamison's movement downward. He said, "He opened his door like he was going to get out after me and I shot him.”

. Although Aaron had the opportunity to confer with the court about the jury charge, he made no complaint about tire inclusion of negligent homicide as a responsive verdict. Even though negligent homicide is legislatively designated as responsive to manslaughter, the defendant may timely object to the instruction on the grounds that the evidence does not support the responsive offense. If the defendant does not enter an objection at trial, then the reviewing court may affirm the conviction if tire evidence would have supported a conviction of the greater offense, whether or not the evidence supports the conviction of the legislatively responsive offense returned by the jury. State ex rel. Elaire v. Blackburn, 424 So.2d 246 (La.1982), cert. denied, 461 U.S. 959, 103 S.Ct. 2432, 77 L.Ed.2d 1318 (1983).