DREW, J.
|, Jeremy Jermaine Brooks was convicted of second degree murder, La. R.S. 14:30.1. His motion for new trial was denied. In due course, he was sentenced to life imprisonment at hard labor without benefits.
He appeals. We affirm the conviction but remand for resentencing.
FACTS
In April of 2009, when this defendant was 17 years of age, a senseless gunfight occurred between rival gangs of young men at the Canaan Village Apartments in Shreveport. Earlier that day, angry words had been exchanged between the defendant and Terrance Holden. When Holden tried to start a fistfight with him, *164 the defendant showed him a gun and declined.
About 30 minutes later, the defendant, along with his brother, Josh Brooks, and friend, Paul Jones (“P.J.”), were sitting outside one of the apartment buildings, when Holden, accompanied by a crowd of people, walked down the hill to start another fight with the defendant.
Josh retrieved an assault rifle from an apartment and fired into the ground. The defendant took the rifle away from Josh and started firing at Holden and his followers. P.J. began firing a handgun at the fleeing crowd.
Terrell Savore, a 15-year-old innocent bystander, tried to escape, but suffered a fatal gunshot wound, falling in a parking lot at the top of the hill.
No bullets or fragments were found in the victim’s body, and no guns were ever recovered. Shell casings, slugs, and bullet jackets were found in various places at the apartment complex.
| ?,The defendant was originally charged with first degree murder, but the indictment was reduced to second degree murder, the crime of conviction.
On July 21, 2011, four days before trial, the state filed a supplemental discovery response advising that Dr. Long Jin, the prosector, had rendered an oral opinion that Terrell had probably died as a result of a gunshot from a handgun, not an assault rifle.[1] This supplemental discovery response was file stamped by the clerk’s office on that same date, but not scanned onto the clerk’s website until July 26, 2011, the day after the jury was selected.
On Tuesday morning, July 26, prior to any testimony, the state advised that the coroner, Dr. Thoma, and the prosecutor, Dr. Jin, would be on vacation until the evening of Thursday, July 28. The state had intended to call Dr. Jin, but instead of doing so, and not to delay the trial, the state offered the autopsy report in lieu of testimony. Defense counsel objected. The autopsy report was not admitted, but the death certificate was.
Defense counsel was not aware of Dr. Jin’s opinion until she received a hard copy of the state’s notice, four days after the verdict.
TRIAL TESTIMONY
Don Ashley, Caddo District Attorney’s investigator, testified that:
• Shreveport gang activity included the Crips, who were located in Cedar Grove, calling themselves the 19s; and the Bottoms Boys, whose territory was centered around the 1100 block of Fannin Street;
• he participated in the investigation of the homicide of Terrell Savore;
Is* Shreveport Police Department Detective Lowell Bowen asked him to question a witness, Jamil Johnson;
• he recovered surveillance videos from Canaan Village Apartments;
• 24 hours of footage was redacted to a 30-minute segment on a disk;
• he and others interviewed more than 30 witnesses to the shooting;
• these apartments contain territory disputed by the two gangs; and
• the police were able to recover the shell casings from the weapons used in the shooting, although the actual weapons were never found.[2]
Jamil Johnson testified that:
*165 • he was 12 years old on the date of the shooting, and at the time of trial, he was 14;
• he lived at Canaan Village with his mother and siblings;
• Josh, P.J., and the defendant hung out around the “C” buildings;
• he was in building C2 when the shooting occurred;
• before the shootings, two groups of people were arguing at the scene;
• someone from the group opposing the defendant said, “Ain’t no guns got to be involved, why can’t we just fight and get this over with”;
• Josh then said, “If we lose somebody going to die”;
• Josh went into an apartment belonging to a person named Alexis;
• when Josh came out of the apartment, he had on a camouflage jacket and carried an assault rifle into which he inserted a clip;
• Josh and the defendant wrestled over the rifle, during which a shot or two discharged into the ground;
• the defendant ended up with the rifle;
• the defendant fired multiple shots toward the parking lot at the top of the hill;
14* the crowd ran away from the defendant, who was shooting at them;
• Paul Jones shot a semiautomatic handgun many times toward the parking lot, which was on the top of the hill, near the “B” buildings;
• shots were also fired from the “B” units down toward the “C” units;
• after the shooting, he saw the defendant and Josh run upstairs;
• he saw Paul run downstairs into an apartment belonging to Alexis;
• the defendant soon left Mel’s apartment, without the rifle;
• Josh, Paul, and the defendant soon left the area on a trail that runs from Dowl-ing to March, and he did not see them again that day;
• at the parking lot, he saw James Thomas, a/k/a Nunu, move Terrell away from gasoline flowing from a truck through the lot;
• Ashley came to interview him the day after the shooting;
• he told Ashley what he saw and watched the videos with him;
• he identified various people in the videos;
• the group on the hill included his cousins, and his cousins’ friend;[3]
• the group down the hill included the defendant, P.J., Josh, and Demetrius, a/k/a Meechie, plus others he couldn’t remember; and
• Quarshay Robinson was the person shooting from the top of the hill.
Jamil Johnson’s sister, Precious Johnson, testified that:
• she was 15 years old at the time of the trial;
• she was standing in front of building B3 when the shooting occurred;
• the defendant had a “chopper,” which she described as a long gun;
• P.J. had a small gun; and
• the defendant and P.J. were shooting “everywhere.”
Sherrelle Savore, Terrell’s twin sister, testified that:
15» earlier on April 13, 2009, she and Terrell and others went to the recreation center to fill out job applications;
• as they were leaving the recreation center, the defendant accused their cousin *166 Ladarius of trying to fight with his little brother;
• later that day, their group was joined by Terrance Holden;
• their group later exchanged angry words with Josh, P.J., and the defendant, at which point Josh said, “If I lose, I’m shooting”;
• P.J. had a handgun, and Josh said he was going to get a gun;
• Josh went and got a “chopper,” lost control of it, and the weapon shot into the ground, at which point the defendant grabbed the gun;
• the defendant began shooting up the hill;
• she ran away, then her sister told her Terrell had been shot;
• she returned to the parking lot and saw her dying brother;
• she heard shots fired from the top and the bottom of the hill; and
• Quarshay Robinson began shooting down the hill after Josh and the defendant repeatedly shot up the hill toward them.
Another one of the victim’s sisters, Kimberly Savore, testified that:
• that day she heard her boyfriend, Terrance Holden, arguing loudly;
• she heard the defendant say, “He ain’t fixing to take no ass whooping, that they fixing to go play pistol play”;
• When Josh got the rifle, the two brothers began fighting over it;
• the gun discharged, then the defendant wrested control from Josh;
• the defendant started shooting at her and her group, so they ran away;
• she saw that P. J. had a handgun; and
• she later returned and saw her injured brother in the parking lot.
Terrance Holden testified that:
• he was serving seven years for home invasion at the time of trial;
|f* he was at the apartments that day visiting his girlfriend, Kimberly Savore;
• earlier that day, he had an argument with the defendant;
• the defendant wouldn’t fight him but did show a pistol, and then left;
• he and the defendant had another confrontation later that day at the Canaan Village Apartments, where he saw P.J. with an assault rifle;
• the first shot was by P.J., and it went into the ground;
• someone unknown to him fired back toward the bottom of the hill;
• there was then gunfire from up and down the hill; and
• Terrell was shot while trying to escape.
Javarrea Cockerm, a/k/a Nuk, testified that:
• he had previously lived at Canaan Village Apartments but was not living there on the day of the shooting, April 13, 2009;
• Josh had the assault rifle first, then the defendant took it from him;
• P.J. had a handgun;
• the defendant and P.J. were firing up the hill;
• a large group of people, including himself and Terrell, ran up the hill to a parking lot, to get away from the shooting;
• he saw Terrell on the ground in the parking lot;
• Robinson returned fire with a .25-caliber handgun from the parking lot;
• Robinson fired only after the assault rifle fired;
• he and his friends were members of the Bottoms Boys; and
• Josh, P.J., and the defendant were Cooper Road gang members.
Ladarius Anderson, a/k/a Peanut, testified that:
• he and Terrell were cousins;
*167 • he saw Josh with the rifle, then saw the defendant get it; and
W P.J. and the defendant began firing up the hill.
Alexis Barber testified that:
• she lived in Canaan Village in a “B” unit at the top of the hill;
• she saw the argument going on down the hill;
• she could not hear what was being said, but they were yelling;
• Josh ran to get a rifle, then shots began being fired up and down the hill;
• Terrell was running away when the bullet struck him; and
• she corroborated testimony from other witnesses about the firearms being utilized and in what directions the participants were shooting.
Andrea Mitchell testified that:
• she lived in one of the “C” buildings at the time of the shooting;
• after the shooting stopped, she heard a knock at her door;
• Meechie and the defendant were standing there, at which time Meechie entered and hid a big gun in her apartment;
• she knew Meechie because he was a friend of her boyfriend, Mel; and
• the defendant stood outside as Meechie hid the rifle.
Sedrikea Ragster, Nuk’s sister, testified that:
• she went to the recreation center that day, along with Nuk, her cousin Sher-relle (the victim’s twin sister), and Peanut (Ladarius Anderson);
• they all went to apply for summer jobs;
• she saw Josh having words with Peanut;
• they left and went to her aunt’s house, where they again ran into Josh;
• there was supposed to be a fight there, but it never happened;
• later that day, she saw the two groups arguing down the hill;
• she heard Josh say that if he lost, he would shoot;
|R* she saw Josh get a rifle, then saw the defendant take it from Josh;
• the defendant and P.J. started firing up the hill; and
• many little children were there, running everywhere.
James Thomas testified that:
• he was living in a “B” unit at Canaan Village Apartments on April 13, 2009;
• he confirmed the testimony of the other witnesses -with regard to the shooting and who was shooting which weapon;
• Terrell was with him at the bottom of the hill when the shooting started, and they both ran up the hill at the same time;
• when he reached the office of the apartment complex, he noticed Terrell was no longer with him, so he turned around to look for him and saw him lying in the parking lot next to a white truck; and
• Terrell was bleeding and asking for help.
Skylar VanZandt of the Shreveport Police Department testified that:
• he got to the crime scene about 6:00 p.m. on the date of the shooting;
• there were two crime scenes, one in the parking lot at the top of the hill, and another at the bottom of the hill near building C2;
• he found 12 spent rifle casings and 21 9 mm pistol casings at C2;
• the police found six .25-caliber casings in the parking lot on top of the hill,
• they later found six more spent pistol casings between Cl and C2;
• another rifle casing was found off the sidewalk in front of C2;
*168 • he made a video of the scene with placards placed at the various locations where evidence was found; and
• the trial diagrams accurately reflected the location of the evidence.
Richard Beighley, firearms section supervisor with the North Louisiana Crime Lab, was qualified as an expert and identified the three Rtypes of firearms involved in this case, even though he never received the firearms.[4]
The defense’s only witness was Lewis Taylor, who lived in building C2 at the bottom of the hill in April of 2009. He testified that he knew who P.J. was, but he did not know the defendant or Josh. He did not see the shooting, as he was in the breezeway of his apartment smoking marijuana when he heard the initial shots, which came from the top of the hill.[5]
VERDICT AND POST-VERDICT PROCEEDINGS
The jury returned a 10-2 verdict of guilty of second degree murder. Motions for new trial and for post-verdict judgment of acquittal were denied.
The motion for new trial was based on newly discovered material evidence which, notwithstanding the exercise of due diligence, was not discovered prior to trial, and that the verdict would have been different had the information been known during trial.
The post-verdict motions were denied, and the defendant timely appealed, urging three issues: (1) insufficiency of the evidence; (2) the evidence supported a manslaughter verdict, instead of second degree murder; and (3) the trial court’s error in not granting a new trial.
DISCUSSION

Sufficiency of the evidence

The defendant argues that:
[ in* the defendant did not want to fight with Holden, the person who was provoking the fight;
• when he showed the handgun, he did not point it at Terrance, and no evidence showed the defendant using a handgun;
• in fact, he fought with his brother over the assault rifle;
• the testimony showed that he did not fire the rifle until he was fired upon;
• when the shots were fired from up the hill, he reasonably believed that he was in imminent danger of losing his life or receiving great bodily harm; and
• the state did not prove that he was not acting in self-defense.
The state responds that:
• the defendant was tried for second degree murder, requiring proof that he had the specific intent to kill or inflict great bodily harm;
• the state has the burden of proof that he did not act in self-defense;
• self-defense is a fact question for the jury;
• the evidence was undisputed that Holden wanted to fistfight with the defendant, but was not armed;
• P.J. had a handgun, and Josh had ready access to an AK-47;
• when Josh fired the weapon into the ground, the defendant grabbed it as all the unarmed people ran up the hill away from the gunfire;
*169 • there was no reason for the defendant to fire upon those who fled;
• the hostilities could have ended there;
• Josh, P.J., and the defendant created the excitement, confusion, and fear when they introduced an assault rifle into the equation;
• a single gunman fired shots down the hill in the defendant’s direction, but not until Josh had fired the assault rifle;
• though there was conflicting evidence, a review of the evidence in the light most favorable to the state must conclude that the .25-caliber handgun was fired after the defendant began firing;
In*the trial court properly charged the jury as to justifiable homicide, self-defense, and the aggressor doctrine;[6]
• the defendant started the argument with Holden earlier in the day at another location, for no apparent reason;
• the defendant could have walked away when Holden came walking down the hill, but he chose to escalate the conflict; and
• the jury reasonably rejected that the shooting was in self-defense.
Our laws on the elements of second degree murder and appellate review of sufficiency considerations are well settled.[7]
*170 I^The evidence presented at trial overwhelmingly supports the state’s case, including the rejection of the defendant’s claims of self-defense. All elements of second degree murder were proven beyond a reasonable doubt.

Evidence supports a finding of manslaughter

We pretermit discussion of this issue, because overwhelming evidence supports the conviction for second degree murder, mooting this assignment.

Denial of motion for new trial based on new evidence

A chronology of events here is crucial: July 25, 2009 — First degree murder indictment is filed;[8]
September 30, 2009 — Autopsy report and photos are provided to the defense;[9]
January 25, 2010 — The state produced the crime lab report;[10]
11sJuly 21, 2011 — The state sends notice, file stamped by the clerk on this date, advising of the prosecutor’s opinion as to probable cause of death;[11]
July 21, 22 and 23, 2011 — Defense counsel checks the clerk’s website for filings;
July 25, 2011 — Defense counsel again checks the clerk’s website on the morning of the first day of trial;
July 25, 2011 — Bill amended to second degree murder and jury is selected;
July 26, 2011 — Clerk scans discovery onto its website;
July 26, 2011 — State announces the two physicians will not be available;
July 28, 2011 — Jury finds defendant guilty as charged (10-2); and
August 1, 2011 — Defense counsel receives a hard copy of the July 21, 2011, filing.
Defendant argues that the jury should have been advised of Dr. Jin’s opinion, and this knowledge could have changed the outcome of the case, as it would have been a more difficult decision for the jury to convict the defendant as a principal to the killing.
La. C. Cr. P. art. 851(3) requires that the trial court must grant a new trial when new and material evidence is discovered after trial if the evidence was not discoverable before or during trial, and the evi *171 dence would probably have changed the verdict or judgment of guilty.
Defendant argues that his right to a trial by jury requires that a jury, not the judge, decide whether he acted as a principal in this case. He claims 114the evidence proves that he was reacting to the circumstances he found himself in rather than aiding and abetting Paul Jones in killing Terrell.
The state notes that the public defender’s secretary, who did not testify, was not sure when the supplemental discovery response was received, nor when it was placed in defense counsel’s box.
The trial court ruled that who actually fired the fatal shot was irrelevant, because there was ample evidence to convict the defendant as a principal. The state also points out that the trial court had instructed the jury on the law of principals, including an instruction that the accused need not have feed the fatal shot to be convicted, but can be guilty as a principal.
The state further takes the position that:
• the jury was told that “we can’t prove which bullet killed him”;
• there was much evidence that the defendant was guilty as a principal;
• transferred intent imposes guilt on both P.J. and the defendant;
• even if the defendant did not intend to kill Terrell, his conduct aided and abetted Jones in doing so by laying down cover fire;
• defendant never argued that Jones was the actual killer;
• defendant knew no bullet had been removed from the victim’s body, no weapons had been found, and that P.J. had fired more than twice the number of shots in the victim’s direction than had the defendant;
• the defendant also had access to autopsy photos that showed a small entry wound inconsistent with assault rifle ammunition;
• Defendant had as much access to Dr. Jin as did the state;
• defendant’s strategy was that of self-defense and manslaughter; and
• the evidence, even if considered to be newly discovered, would not have changed the verdict.
| La. C. Cr. P. art. 851 states in pertinent part as follows:
The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded.
The court, on motion of the defendant, shall grant a new trial whenever:
[[Image here]]
(3) New and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty.
In State v. Coleman, 2005-1617 (La.6/29/07), 959 So.2d 465, the supreme court stated a defendant seeking a new trial based on newly discovered evidence must establish four elements: (1) that new evidence was discovered after trial; (2) the new evidence is material; (3) the failure to discover the evidence was not due to a lack of diligence on the part of the defense; and (4) had the evidence been introduced, the verdict or judgment of guilty probably would have been changed. When a defendant alleges newly discovered evidence after trial, the ruling on a new trial motion rests within the sound discretion of the trial judge.
*172 Suppression by the prosecution of evidence favorable to an accused upon his request for such evidence violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); State v. Barker, 628 So.2d 168 (La.App. 2d Cir.1993), writ denied, 635 So.2d 236 (La.1994).
 |1(iThe term “Brady violation” is sometimes used to refer to any breach of the broad obligation to disclose exculpatory evidence.[12]
In State v. Black, 34,688 (La.App.2d Cir.5/9/01), 786 So.2d 289, writ denied, 2001-1781 (La.5/10/02), 815 So.2d 831, the court stated that under Brady, the state must disclose all evidence material to guilt or punishment and favorable to the defendant. The state’s duty of disclosure under Brady applies irrespective of the nature of the discovery request and even when a request has not been made. Evidence is material for Brady purposes if there is a reasonable probability, sufficient to undermine confidence in the outcome, that disclosure of the evidence would have produced a different result. The question to be answered is whether the undisclosed evidence would have created a reasonable doubt that would not otherwise exist, with reasonable doubt being determined in the context of the entire record. Failure to comply with discovery merits mistrial only when the state’s conduct substantially affects a defendant’s right to prepare a defense, or when it rises to the level of a legal defect. The trial court may offset the effect of late disclosure of information to the defendant by calling a recess[13] or granting a continuance and the propriety of the remedy for late disclosure of information depends on the circumstances of each case.
|17We do not find error in the trial court’s denial of defendant’s motion for new trial. All applicable law was explained to the jury, and the evidence was abundant and convincing that the defendant took part in the shooting which resulted in the death. Whether Dr. Jin’s testimony would have had an impact on the jury is highly questionable, and certainly not probable.
In a perfect world, the prosecutor would have immediately advised opposing counsel as to Dr. Jin’s opinion, either orally, by fax transmission, by text, by email, by a runner, or in open court. Also, in a perfect world, public defenders would have a file-stamp process to indicate the date and time of the receipt of all documents.
The world is far from perfect, however, and unhurried hindsight provides amazing clarity, as contrasted with the pressure and time constraints of lawyers making final preparations for a jury trial. This factual situation is not ideal, but falls far short of reversible error.
Dr. Jin was available for interviews for months before trial. His opinion as to the *173 probable origin of the fatal bullet was there for the asking. In any event, we agree with the trial court’s decision that timely knowledge of this information would not have altered the verdict.
Because of the defendant’s age at the time of the murder, we remand for resen-tencing, in light of recent jurisprudence forbidding mandatory life sentences, with no possibility of parole, for offenders under the age of 18 at the time of the crime.[14]
|18DECREE
The conviction is AFFIRMED. The sentence is VACATED, and the case is REMANDED for resentencing.
CARAWAY, J., concurs with written reasons.

. All witnesses agreed that Paul Jones, not the defendant, was the person firing the pistol from the bottom of the hill, toward the fleeing crowd at the top of the hill.

. Shell casings found at the bottom of the hill were from an assault rifle and a 9 mm pistol. Six .25-caliber shell casings were found at the top of the hill.

. Their names were Javis; Ladarius, a/k/a Peanut; Javarrea, a/k/a Nuk; and Tim.

. Beighley was able to microscopically compare the marks left by the discharging of those weapons and determine that there were a total of three guns involved: a .30-caliber rifle, a 9mm handgun, and a .25-caliber automatic Colt pistol.

. No other witness testified that the first shots came from the top of the hill.

. La. R.S. 14:20(A)(1). Justifiable homicide.
A homicide is justifiable under La. R.S. 14:20 when committed in self-defense by one who reasonably believes that he is in imminent danger of losing life or receiving great bodily harm and that the killing is necessary to save himself from that danger.
La. R.S. 14:21. Aggressor.
A person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict.
When self-defense is raised as an issue by a defendant, the state has the burden of proving, beyond a reasonable doubt, that the homicide was not perpetrated in self-defense. State v. Garner, 39,731 (La.App.2d Cir.9/8/05), 913 So.2d 874, writ denied, 2005-2567 (La.5/26/06), 930 So.2d 19. Factors to consider in determining whether a defendant had a reasonable belief that the killing was necessary include the excitement and confusion of the situation, the possibility of using force or violence short of killing, and the defendant’s knowledge of the assailant's bad character. State v. Spivey, 38,243 (La.App.2d Cir.5/12/04), 874 So.2d 352. Although there is no unqualified duty to retreat, the possibility of escape is a factor to consider in determining whether a defendant had a reasonable belief that the use of deadly force was necessary to avoid the danger. State v. Brown, 414 So.2d 726 (La.1982); State v. Spivey, supra.

. In 2009, La. R.S. 14:30.1, Second degree murder, stated, in pertinent part:
A. Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm.
The standard for review in cases that raise sufficiency of the evidence is found in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The Jaclcson standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, 2005-0477 (La.2/22/06), 922 So.2d 517; State v. Dotie, 43,819 (La.App.2d Cir. 1/14/09), 1 So.3d 833, writ denied, 2009-0310 (La. 11/6/09), 21 So.3d 297. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La. 10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part. State v. Eason, 43,788 (La.App.2d Cir.2/25/09), 3 So.3d 685, writ denied, 2009-0725 (La. 12/11/09), 23 So.3d 913; State v. Hill, 42,025 (La.App.2d Cir.5/9/07), 956 So.2d 758, writ denied, 2007-1209 (La. 12/14/07), 970 So.2d 529. The trier of fact is charged to make a credibility determination and may, within the bounds of rationality, accept or reject the testimony of any witness; the reviewing court may impinge on that discretion only to the extent necessary to guarantee the *170 fundamental due process of law. State v. Casey, 1999-0023 (La. 1/26/00), 775 So.2d 1022, cert. denied, 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000).
An appellate court reviewing the sufficiency of the evidence must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstantial evidence must be sufficient for a rational juror to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime. State v. Jacobs, 504 So.2d 817 (La. 1987); State v. Adkins, 39,724 (La.App.2d Cir.6/29/05), 907 So.2d 232, writ denied, 2006-2514 (La.5/4/07), 956 So.2d 607.

.The original bill of indictment was filed exactly two years before the commencement of trial for the amended charge of second degree murder.

. The autopsy report revealed that the pathologist did not find any bullet or bullet fragments in the body of the victim. The small entry wound is clearly visible.

. The report reflected that 40 shell casings were delivered for analysis: 27 of the shells were 9 mm and 13 were from an assault rifle. No guns were submitted for comparison, and the response indicated that the police never found any weapons.

. We could not find in the record the actual date on which the prosecutor conducted his pretrial interview with Dr. Jin, the point at which the state learned of prosecutor's opinion that death was probably caused by a pistol shot.

. There are actually three components of a true Brady claim: (1) The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the state, either wilfully or inadvertently; and, (3) prejudice must have ensued. State v. Garrick, 2003-0137 (La.4/14/04), 870 So.2d 990. A discovery violation involving the state’s failure to disclose exculpatory evidence does not require reversal as a matter of the due process clause unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different result. Id.

. The disputed document was scanned and available by the second day of trial.

. See Miller v. Alabama, -U.S.-, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012); Graham v. Florida, 560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010); State v. Simmons, 2011-1810 (La.10/12/12), 99 So.3d 28; and State v. Graham, 2011-2260 (La.10/12/12) 99 So.3d 28.