GARRETT, J.
_JjThe defendant, Harold L. Free, was convicted as charged of second degree murder in the shooting death of his 21-year-old stepson. He was sentenced to the mandatory sentence of life imprisonment without benefit of parole, probation or suspension of sentence. We affirm the defendant’s conviction and sentence.
FACTS
On the night of August 2, 2010, the victim, Terry Johniken, Jr. (“T.J.”), was staying in the Shreveport mobile home where his mother, Kathy Free, and her husband, the defendant, resided. Due to an escalating verbal confrontation between the men, Mrs. Free placed a call to the 911 operator and requested police assistance. Before officers arrived, the defendant, who was armed with two guns, shot his unarmed stepson between the eyes. The shooting, which occurred at about 11:15 p.m., and the moments leading up to it were captured on the 911 recording. T.J. was transported to a hospital where he was declared brain dead and kept on life support until his organs could be harvested for donation.
The defendant was arrested and, following T.J.’s death, was indicted for second degree murder. After a jury trial in August 2012, he was convicted as charged by a vote of 10 to two. Motions for new trial and post-verdict judgment of acquittal were denied. The trial court imposed the mandatory sentence of life imprisonment without benefits.
[2The defendant appealed, asserting 20 assignments of errors.[1]
SUFFICIENCY OF EVIDENCE
In two assignments of error, the defendant challenges the sufficiency of the evidence presented against him. Specifically, he argues that the jury erred in finding that the evidence was sufficient to support a conviction of second degree murder or to refute the defendant’s claim of self-defense. Additionally, he alleges that the trial court erred in denying the defense motion for post-verdict judgment of acquittal. The defendant maintains that even if the case was not self-defense, this court should enter a conviction for manslaughter rather than for second degree murder.
Evidence
The evidence revealed that the defendant and his stepson had a tumultuous relationship. T.J. had ADHD and dyslexia. His ability to read was, at best, extremely limited. Although he sporadically worked at plant nurseries, he had no regular job. T.J. also had a history of drug abuse.
The defendant met T.J.’s mother in 1996, when T.J. was about eight years old, and married her in 2008. The defendant *961 testified that he “totally disliked” T.J. within weeks of meeting him and candidly admitted that he “hated” the young man. Witnesses testified that on several occasions — including the day of the shooting— the defendant said that all T.J. needed was “a bullet and a body bag.” The defendant admitted making the statements but dismissed them as “off the cuff’ comments. Another witness ^testified that when her stepson died, the defendant said he wished that T.J. had died instead of her stepson.
The relationship between the defendant and T.J. was marked by episodes of violence. In 2008, T.J. came to the defendant’s mobile home to hide from the police. Ultimately, the men got into a physical confrontation; the defendant ended up tackling T.J. and restraining him until the police arrived. Because T.J. was so out of control, the police had to place him in a paddy wagon.
In January 2010, T.J. came to the defendant’s mobile home seeking money. The defendant told him to leave and threw a plastic patio chair at him. T.J. picked up the chair and threw it back, hitting the defendant in the head. The defendant threw another chair at T.J., which hit the young man’s legs. T.J. again responded by throwing the chair back, hitting the defendant in the head a second time. When the police arrived, T.J. was arrested and charged with aggravated battery. He pled guilty to two counts of misdemeanor battery. After serving about six months in jail, T.J. was placed on probation and released.
T.J.’s release occurred about two weeks before the shooting. After his release, he lived with his mother and the defendant in the defendant’s mobile home. T.J. had his own bedroom in the mobile home. On the morning of the shooting, the defendant helped T.J. obtain a driver’s license for the first time. T.J. used the home address of the Frees as his address on the license. Afterwards, when they were en route to meet Mrs. Free for lunch, the defendant told T.J. he would not be allowed to drive his company struck or Mrs. Free’s car, and the men argued. The defendant testified at trial that T.J. threatened his life five times that day.
After an unpleasant meal ruined by T.J.’s embarrassing antics in the restaurant, T.J. left with his mother. The defendant went to the Caddo Parish Coroner’s Office to inquire into having T.J. committed. The defendant described T.J. as a drunken, suicidal drug addict and was told that being suicidal met the criteria for commitment. He left the office and returned at about 2:45 p.m. and told the woman who was assisting him that he would “take care of it” himself. The defendant testified that he was under the impression that the coroner’s office could not get him what he needed.
Betty Wilburn, an employee at the coroner’s office, testified that the defendant came to the office twice that day; she said the first time was probably late morning and the second visit was at 2:50 p.m. Ms. Wilburn testified that she concluded that the defendant’s stepson was committable and thus could be held in a hospital for 72 hours. However, she said she did not write the commitment order because the defendant told her that he and his wife wanted to find out from the district attorney’s office if T.J.’s early release from jail could be revoked. The defendant indicated to her that under a revocation, T.J. could be locked up for 90 days instead of the three days available under a commitment. Ms. Wilburn testified that she informed the defendant that investigators were available 24/7 if needed to follow up on the coroner’s commitment.
|,/While at the coroner’s office, the defendant encountered a family acquaintance, *962 Ronald Carraway, who described the defendant as “aggravated” and “mad.” He told Mr. Carraway that the authorities would not commit T.J. so he would “take care of it” himself. The defendant further told Mr. Carraway that all T.J. needed was a “bullet in the head and a body bag.” Mr. Carraway testified that he had heard the defendant use that expression about T.J. several times in the past.
Geya Prudhomme, a prosecutor in the Caddo Parish District Attorney’s Office, testified that the defendant called her that afternoon and she returned the call. They talked about T.J. She testified that the defendant sounded flustered and upset. She told him to call the police if he needed assistance with T.J. However, she also advised that she could not guarantee that the police would arrest T.J., as an arresting officer had an option to issue a summons instead in some situations.
The defendant went to Wal-Mart where, at 5:28 p.m., he purchased ammunition for his .38 revolver. Although he had the gun since 1979, he had never before bought fresh bullets for it. When he got home, he reloaded the gun with the new bullets. This gun was kept between the cushion and arm of the love seat in the living room.
The defendant claimed that, due to neck issues, he was physically fragile and that a violent blow to his neck could kill or paralyze him. As a result, he claimed to fear his much younger stepson. However, the defendant worked as a “repo man,” loading and unloading repossessed vehicles. Due to the potential for danger in his line of work, the defendant ^routinely carried an American Arms .22 Magnum Derringer. However, earlier on the day of the shooting, he was not carrying the Derringer. He armed himself with the weapon after he returned home that evening, placing it in the front pocket of his pants.
When the defendant arrived home that evening, his wife and T.J. were already there. T.J. was in his bedroom. The defendant and his wife watched television; his wife also did laundry. They both drank vodka and grapefruit juice. T.J. came out of his bedroom, went outside to smoke, and then returned to his room without talking to the defendant.
Mrs. Free testified that at about 8:00 p.m. the defendant (who was about six feet tall and weighed approximately 230 pounds) told her that if she did not take T.J. to work with her in the morning, he was going to have his son Jeff (who was 5'11" and weighed 300 pounds) come over. The defendant threatened that while one held T.J. down, the other would “black” both his eyes and knock out some of his teeth before throwing him out. (According to the pathologist who performed the autopsy, T.J. was 5'8" and weighed 141 pounds.) She further testified that at one point in the evening, the defendant got up from his recliner, walked over to where she was sitting on the couch, got in her face and told her that he hated her as much as “that little son of a bitch in that front bedroom” and that he would have her out in two days. She described him as visibly angry with balled up fists, gritted teeth and a totally red face. Mrs. Free told him to calm down and sit down.
17Mrs. Free retired to the master bedroom at about 10:00 p.m. and called her daughter, Crystal Runnels, for their daily phone conversation. The bedroom door was open. According to Mrs. Free, the mobile home was small enough that she could hear what was said in the kitchen and living room. She did not hear any arguing from the living room. While Mrs. Free was on the phone, the defendant came into the bedroom carrying his .38 revolver and told her that she had better come see about her son. According to *963 Mrs. Free, the defendant recounted to her that when T.J. came out of his room to get a snack in the kitchen, he told the defendant that he wished the defendant’s brother would die.
What occurred in the living room of the mobile home in the next few minutes is highly contested. At some point, Mrs. Runnels told her mother to terminate their call and phone the 911 operator. Mrs. Free did so and the recording of the 911 call documents a portion of what happened.
Mrs. Free described the defendant and T.J. as engaging in a “stop and go” argument, exchanging vulgarities. Mrs. Free placed herself between them, and no punches were thrown between the men. However, at one point, the defendant forcefully pushed her out the front door and called her a whore; she came back inside. T.J. told the defendant not to hurt his mother. The defendant was armed with both the .38 revolver and the .22 Derringer. T.J., who was wearing only a pair of long shorts, was barefoot and unarmed. Mrs. Free testified that she and T.J. both told the defendant to put the guns down; he refused. At one point, T.J. made a hand motion with his right index finger out and thumb up at the defendant. Mrs. Free endeavored to |sget T.J. to return to his bedroom. She testified that as she and her son turned to go toward his bedroom, the defendant said, “T.J., turn around; I have something for you.” She and T.J. turned around, and the defendant fired a shot. Mrs. Free mistakenly believed that he discharged the .88 revolver. The fatal bullet was actually fired from the .22 Derringer. The bullet, which Mrs. Free said missed her by inches, struck T.J. between the eyes. He collapsed in his bedroom in front of the dresser. She testified that she screamed at her husband, who said he would say T.J. was a burglar.
The defendant’s account of the night of the shooting was different. He testified that he stopped and bought new ammunition for the .38 revolver on his way home because his father-in-law had suggested in early July that he needed fresh bullets for that weapon. He armed himself with the .22 Derringer after returning home. When questioned by the prosecutor, he could not articulate why he felt the need to do so. The defendant further said that he took the .38 revolver with him when he went to get his wife from the master bedroom because he was not going to leave a loaded gun near his stepson. However, he was not concerned about T.J. arming himself with a kitchen knife because “a man bringing a knife to a gun fight” didn’t make sense to him.
The defendant said that T.J. — who was supposed to stay in his room that evening and not talk to him — came out of his bedroom and went to the kitchen. Upon hearing the sound of silverware, the defendant initiated conversation with T.J. by asking what he was doing. The defendant did not recall T.J.’s response to his query. However, the defendant testified that 19T.J. then swore at him in a “devilish,” growling type of voice. According to the defendant, he and T.J. exchanged insults and vulgarities, and the argument escalated into T.J. making threats against the lives of the defendant and his brother. The defendant testified that he went to get his wife, believing that she could control her son. According to the defendant, Mrs. Free and her son screamed at each other and he feared for his wife’s safety. He stated that he tried to get his wife and leave with her. But she told him not to touch her; likewise, T.J. told him not to touch his mother. The defendant admitted that he knew that his wife was on the phone with the 911 operator and that the police were on the way. He also admitted saying to *964 T.J.: “I’ll kill you dead, boy.” The defendant testified that T.J. — -who was more than 18 feet away from him — took “one or two” steps toward him. He then shot T.J. with the .22 Derringer. The defendant insisted that he was not a marksman and that it was a “fluke” that he hit T.J. between the eyes.
The 911 recording, which was played for the jury, includes not only Mrs. Free’s conversation with the 911 operator, but also the voices of the defendant and T.J. in the background during the moments leading up to the shooting. Some of the dialogue is inaudible and portions of the tape are difficult to understand. The defendant can be heard shouting, “You come here and start talking about my goddamn brother dying!” and “I ain’t gonna tell you but once.” As Mrs. Free gave the operator her address, she said, “Stop! Stop, T.J.!” When the operator asked who is fighting, Mrs. Free replied, “My husband has got two guns pointed at my son.” When asked 110what her husband’s name is, she said, “His name is Harold Free and he thinks he can shoot anybody but I fucking live here and he’s staying here.” When the 911 operator asked Mrs. Free to leave the noisy area, she said, “My husband will lie. I’ve got to watch everything.” As the conversation continued, the arguing between the defendant and T.J. became louder and more intense. Mrs. Free told them both to shut up. The defendant then shouted, “I’ll kill you dead, boy!” T.J. said, “Get the gun out of my goddamn face” and then “Look, mom, he’s got the gun in my face.” At one point, Mrs. Free said, “You can’t shoot somebody in your house” and the defendant replied, “That boy can’t do shit, Kathy.” Mrs. Free responded with, “He’s not a burglar!” and the defendant said, “He don’t belong here!” Both Mrs. Free and T.J. can be heard telling the defendant to stop pushing Mrs. Free. Finally, the loud gunshot can be heard on the tape and Mrs. Free screamed, “He ain’t got no gun!”
After shooting T.J., the defendant went into the master bedroom and put his two guns on the bed. He placed a call to the 911 operator in which he repeatedly asked her to “Help me.” He told the 911 operator that he thought he hit T.J. in the stomach and requested an ambulance. He did not attempt to administer first aid to his mortally wounded stepson.

Self-Defense

Law
La. R.S. 14:30.1 provides, in part:
A. Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm.
|nLa. R.S. 14:20 provides, in part:
A. A homicide is justifiable:
(1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.
[[Image here]]
C. A person who is not engaged in unlawful activity and who is in a place where he or she has a right to be shall have no duty to retreat before using deadly force as provided for in this Section, and may stand his or her ground and meet force with force.
D. No finder of fact shall be permitted to consider the possibility of retreat as a factor in determining whether or not the person who used deadly force had a reasonable belief that deadly force was reasonable and apparently necessary to prevent a violent or forcible felony in *965 volving life or great bodily harm or to prevent the unlawful entry.
La. R.S. 14:21 provides:
A person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict.
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 807, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Tate, 2001-1658 (La.5/20/03), 851 So.2d 921, cert, denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004).
|12The appellate court does not assess the credibility of witnesses .or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part. State v. Eason, 43,788 (La.App.2d Cir.2/25/09), 3 So.3d 685, writ denied, 2009-0725 (La.12/11/09), 23 So.3d 913; State v. Johnson, 47,913 (La.App.2d Cir.4/10/13), 113 So.3d 1209.
When self-defense is raised as an issue by the defendant, the state has the burden of proving, beyond a reasonable doubt, that the homicide was not perpetrated in self-defense. State v. Gamer, 39,731 (La.App.2d Cir.9/8/05), 913 So.2d 874, writ denied, 2005-2567 (La.5/26/06), 930 So.2d 19; State v. Palmer, 45,627 (La. App.2d Cir.1/26/11), 57 So.3d 1099, writ denied, 2011-0412 (La.9/2/11), 68 So.3d 526.
Factors to consider in determining whether a defendant had a reasonable belief that the killing was necessary are the excitement and confusion of the situation, the possibility of using force or violence short of killing, and the defendant’s knowledge of the assailant’s bad character. State v. Spivey, 38,243 (La.App.2d Cir.5/12/04), 874 So.2d 352; State v. Thomas, 43,100 (La.App.2d Cir.4/30/08), 981 So.2d 850, writ denied, 2008-1276 (La.2/6/09), 999 So.2d 769.
Discussion
The defendant first contests the state’s proof that he had the specific intent to kill T.J. when he fired the shot. Evidence demonstrating the defendant’s intent toward T.J. include the defendant’s declaration only 11shours before the shooting that all T.J. needed was “a bullet in the head and a body bag,” as well as his action in purchasing for the first time new bullets for a .38 revolver he had for 30 years and arming himself with the .22 Derringer when he arrived home that evening. Even more important, in this case there is a contemporaneous recording of the defendant yelling, just moments before shooting the unarmed T.J. in the face, “I’ll kill you dead, boy!” The defendant attempted in his trial testimony to minimize this declaration by describing it as a mere “warning.” However, this statement may be appropriately characterized as a devastating admission against interest in which the defendant, who was armed with two loaded weapons, laid bare his intent toward his unarmed stepson. Because the defendant explicitly threatened to kill T.J. just before shooting him and testified at trial that he intended to inflict great bodily harm, the record contains ample proof that the defendant had the specific intent to kill his stepson.

*966
Manslaughter

Law
In his motion for post-verdict judgment of acquittal, the defendant asked the trial court to reduce the verdict to manslaughter. The trial court noted that the defendant had not argued this during trial but had instead relied solely upon self-defense.
Manslaughter is defined as a homicide that would be second degree murder, but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. La. R.S. 14:31(A)(1); State v. Miller, Iu36,003 (La.App.2d Cir.7/25/02), 824 So.2d 1208', writ denied, 2002-2480 (La.6/27/03), 847 So.2d 1253. Sudden passion and heat of blood are mitigatory factors in the nature of a defense which exhibits a degree of culpability less than that present when the homicide is committed without them. State v. Lombard, 486 So.2d 106 (La.1986); State v. Williams, 44,977 (La.App.2d Cir.1/27/10), 32 So.3d 902, writ denied, 2010-0368 (La.9/24/10), 45 So.3d 1071.
The defendant bears the burden to prove, by a preponderance of the evidence, that he acted in sudden passion or heat of blood in order for manslaughter to be appropriate. State v. Logan, 45,136 (La. App.2d Cir.4/14/10), 34 So.3d 528, writ denied, 2010-1099 (La.11/5/10), 50 So.3d 812; State v. Lang, 42,125 (La.App.2d Cir.5/30/07), 960 So.2d 318, writ denied, 2007-1469 (La.1/11/08), 972 So.2d 1161; State v. Hendricks, 38,945 (La.App.2d Cir.9/22/04), 882 So.2d 1212, writ denied, 2004-2833 (La.3/18/05), 896 So.2d 1000.
Provocation and the time for cooling are questions for the trier of fact to determine according to the standard of the average or ordinary person. State v. Horn, 45,706 (La.App.2d Cir.11/3/10), 55 So.3d 100, unit denied, 2010-2721 (La.5/6/11), 62 So.3d 124. The appellate court must determine whether a rational trier of fact, upon reviewing the evidence in the light most favorable to the prosecution, could have found that these mitigating factors had not been established by a preponderance of the evidence. State v. Robinson, 32,794 (La.App.2d Cir.3/1/00), 754 So.2d 311, writ denied, 2000-0989 (La.3/23/01), 787 So.2d 1008; State v. Lewis, 28,973 (LaAppgd,, Cir.12/11/96), 685 So.2d 1130, writ denied, 97-0122 (La.5/16/97), 693 So.2d 797. Physical threats or actions on the part of the victim have been found to be sufficient provocation. State v. Wright, 42,956 (La.App.2d Cir.3/5/08), 978 So.2d 1062, writ denied, 2008-0819 (La.10/31/08), 994 So.2d 532. Even so, mere words or gestures, no matter how insulting, will not reduce a homicide from murder to manslaughter. State v. Wright, supra.
Although a trial judge has the power to reduce a verdict in an appropriate case under La. C. Cr. P. art. 821(C), the evidence in this case fully supports the second degree murder verdict and not manslaughter. The defendant was a willing and active participant in the argument that led to the shooting, and despite T.J.’s verbal threats, a reasonable person would not have been so enraged by the unarmed victim’s conduct that he would have been deprived of self-control.
These assignments of error lack merit.
CROSS-EXAMINATION OF VICTIM’S MOTHER
The defendant argues that the trial court erred in curtailing his efforts to present evidence of his continuing relationship with the victim’s mother after the shooting. During cross-examination of Mrs. Free, defense counsel began to ques *967 tion her about her relationship with the defendant following the shooting. The prosecutor objected and the jury was removed. A vigorous discussion occurred outside the presence of the jury. Apparently the defense intended to ask Mrs. Free about intimate marital relations. The prosecutor argued that this line of inquiry was irrelevant and not designed to impeach the witness. Defense counsel argued that the inquiry of whether |1fiMrs. Free was “willing to lie with” the defendant after he killed her son was relevant to her credibility. The trial court questioned the line of inquiry and noted that there had been no testimony elicited at that point that Mrs. Free was afraid of the defendant. The court sustained the prosecutor’s objection to testimony concerning intimate marital relations between the Frees.
Review of the record reveals that the defendant failed to object to the trial court’s ruling. Therefore, this alleged error was not preserved for review on appeal. See La. C. Cr. P. art. 841(A). However, we note that the defendant had a thorough and complete opportunity to cross-examine Mrs. Free about a -wide-ranging array of subjects. The jury was fully aware from the testimony of Mrs. Free and the defendant that they were still married at the time of trial and had contact with each other after the shooting. Further, the defendant testified that he was the party who had attempted to begin divorce proceedings after the shooting. Although the alleged error was not preserved for appeal, the record as a whole shows that the jurors were presented with evidence regarding the nature of the Frees’ relationship after T.J.’s death and could draw their own conclusions about the credibility of the witnesses.
This assignment of error is without merit.
MOTION FOR CONTINUANCE
The defendant contends that the trial court erred in denying his motion for continuance. At the outset of jury selection, the prosecutor provided a series of crime scene photographs to the defendant as a part of the state’s continuing discovery obligation. The defendant, who was out on |17bond, asked for a delay in the trial in order to go over the photos to explore their, significance. After reviewing the photos, the trial court denied the motion for continuance. The court noted that the photos were not gruesome and that they were pictures of the doorways and hallways of the mobile home where the shooting occurred. It stated that defense counsel could object contemporaneously to the introduction of the photos.
The decision to grant or deny a motion for continuance rests -within the sound discretion of the trial court, and a reviewing court will not disturb a trial court’s determination absent a clear abuse of discretion. La. C. Cr. P. art. 712; State v. Hams, 2001-2730 (La.1/19/05), 892 So.2d 1238, cert, denied, 546 U.S. 848, 126 S.Ct. 102, 163 L.Ed.2d 116 (2005); State v. Moffett, 47,430 (La.App.2d Cir.9/26/12), 105 So.3d 138, writ denied, 2012-2464 (La.4/12/13), 111 So.3d 1017. Even when an abuse of discretion is shown, the supreme court typically declines to reverse a conviction based on denial of a continuance absent a showing of specific prejudice. State v. Harris, supra; State v. Maffett, supra. A motion for a recess is evaluated under the same standards as a motion for a continuance. State v. White, 389 So.2d 1300 (La.1980).
It is not clear from the record which or how many of the crime scene photos were submitted at this time. However, the photos are all relatively self- *968 explanatory; they show various parts of the mobile home where the shooting took place. The trial did not commence until the middle of the next day, giving the defense adequate time to review the photos. All of the crime scene photos offered by the state during the trial were admitted |1Rwithout objection by the defense. We also note that the defense likewise presented some pictures to opposing counsel at the beginning of voir dire. Thus, both sides were still exchanging evidence. On this record, there is no showing of any prejudice in connection with the denial of the motion for continuance.
This assignment of error is without merit.
JURY INSTRUCTIONS
The defendant complains that the trial court erred in overruling the defense’s objections to a proposed jury instruction requested by the state.
The jury instructions were discussed prior to the taking of any testimony. At the request of the defense, the trial court agreed to include the following language in the court’s proposed jury charge:
If you find the defendant used deadly force in defense of his person or property, you shall not consider the possibility of retreat as a factor in determining whether or not the defendant had a reasonable belief that such deadly force was reasonable and apparently necessary to prevent a violent or forcible felony involving danger to life or great bodily harm.
If you find that the defendant was not engaged in unlawful activity and was in a place where he had a right to be, the defendant had no duty to retreat before using deadly force and had the right to stand his ground and meet force with force.[2]
At the request of the state, the trial court also agreed to include the following language:
[ Although there is no qualified duty to retreat, the possibility of escape is a factor to consider in determining whether a defendant had a reasonable belief that the use of deadly force was necessary to avoid the danger.
This language was taken from State v. Aaron, 45,433 (La.App.2d Cir.1/12/11), 57 So.3d 365, writ denied, 2011-0634 (La.6/24/11), 64 So.3d 220, writ granted, judgment ajfd in part, rev’d in part, 2011-0307 (La.6/24/11), 66 So.3d 18. The defendant objected to its inclusion. The basis for the objection was “when there are exigent circumstances,” there is no duty to retreat or escape. He further argued that the jury would be confused by the difference between “escape” and “retreat.” The state asserted that the statement was the law in this circuit. The trial court agreed, citing State v. Aaron, supra, and State v. Wright, supra.
The argument made on appeal is that the jury instructions were confusing and contradictory. Although not argued below or now, we note that the cases relied upon below involved homicides that occurred prior to the 2006 amendment of La. R.S. 14:20. In State v. Ingram, 45,546 (La. *969 App.2d Cir.6/22/11), 71 So.3d 437, writ denied, 2011-1630 (La.1/11/12), 77 So.3d 947, habeas corpus granted on other grounds, 12-3111, — F.Supp.2d -, 2013 WL 5934498 (W.D.La. Nov. 1, 2013), this court had occasion to consider the 2006 amendments to La. R.S. 14:20. This case was not brought to the attention of the trial court. In the Ingram case, the homicide occurred in October 2006, after the amendment to La. R.S. 14:20 became effective on August 15, 2006. The defendant in that case shot and killed his ex-wife with a hunting rifle when she was in his home and engaged in a physical altercation with his current wife. Originally charged with second degree 12nmurder, Ingram was convicted of manslaughter after the jury rejected his claim of justifiable homicide. Although not in the context of a jury instruction issue, this court made the following observations about the 2006 amendment to La. R.S. 14:20:
Louisiana R.S. 14:20 sets out the law in cases where the use of force or violence in defense results in a homicide. That statute, which has recently been supplemented and clarified by the legislature, outlines a number of scenarios where a homicide is justifiable....
[[Image here]]
With [the addition of (C) and (D) ], the legislature has curtailed the evidence that may be offered by the State in proving the use of force unreasonable, and specifically has forbidden the consideration of the possibility of retreat vis-a-vis the use of force. This represents a change in the law, which formerly allowed the consideration of the possibility of escape; see, e.g., State v. Brown, 414 So.2d 726 (La.1982).
However, this court then continued:
The unavailability of the retreat defense does not end the inquiry into the reasonableness of the use of force even when the accused is in his own home. Apart from the “unlawful activity” and “has a right to be” qualifiers, Section C recognizes that a person may “meet force with force.” That is the crux of this case — whether [the defendant’s] use of deadly force was a proportional response to the force used or threatened by [his ex-wife]. After considering the entire record, we conclude that a rational trier of fact could have found beyond a reasonable doubt that [the defendant] acted unreasonably in using deadly force against [his ex-wife].[3]
In the instant case, the trial court may have erred in stating that the “possibility of escape” language requested by the state was the current law | ¡¡fin the second circuit in light of the 2006 amendment and this court’s analysis of the new legislation in the Ingram case.[4] However, this dis *970 tinction was not addressed below. We conclude that if any error was made, it was certainly harmless under the circumstances presented in the instant case.[5] First, we note that the defendant himself raised the issue of the possibility of escape in front of the jury during his direct examination. While attempting to explain statements on the 911 recording by both his wife and his stepson that he was pushing his wife during the altercation, the defendant testified that he tried to get his wife and leave the mobile home with her because he feared for her safety during the escalating confrontation. He testified that she told him not to touch her and he backedj^off. He then reiterated that he tried to get out of the mobile home but could not.
Furthermore, La. R.S. 14:20 contains qualifying language. It provides that a person has no duty to retreat only when he is “not engaged in unlawful activity” and then he may “meet force with force.” According to the evidence presented at trial — including Mrs. Free’s testimony and the 911 call — the defendant was threatening his stepson with two loaded guns during a verbal argument (aggravated assault) and pushing his wife (simple battery or domestic abuse battery). Thus, it appears that the defendant’s conduct in this case was not covered by the provisions of the statute. Reasonable jurors could have concluded that the “no duty to retreat” provision did not apply to the defendant because he was engaged in unlawful activity and that his action in shooting T.J. was not a proportional response to any conduct by the young man.
Based on the above-stated reasons, we find no reversible error in the inclusion of the “possibility of escape” language under all of the circumstances of this case.
This assignment of error lacks merit.
PRIOR BAD ACTS BY DEFENDANT
The defendant contends that the trial court erred in allowing the state to present evidence of his prior bad acts without prior notice and in failing to grant a defense motion for mistrial. The “prior bad acts” *971 were unfulfilled threats the defendant allegedly made against the victim. Mrs. Free testified that on the night of the shooting, the defendant told her that, if she did not Intake T.J. to work with her the next morning, he would have his son Jeff come over and help him beat T.J. and throw him out. The defendant objected that this testimony was inadmissible under La. C.E. art. 404(B) and that the state had not provided the defendant with proper notice; he also requested a mistrial.
The prosecutor argued that the statement was not a crime and that the defendant had been informed about the statement when the state provided him with an excerpt from grand jury testimony. The court reviewed the grand jury transcript and found the portion of Mrs. Free’s testimony where she related the same information. The judge found that the statement did not fall under La. C.E. art. 404(B) and suggested that the information fell under what formerly was res gestae. The court overruled the objection and denied the motion for mistrial.
La. C.E. art. 801(D) provides in relevant part:
(4) Things said or done. The statements are events speaking for themselves under the immediate pressure of the occurrence, through the instructive, impulsive and spontaneous words and acts of the participants, and not the words of the participants when narrating the events, and which are necessary incidents of the criminal act, or immediate concomitants of it, or form in conjunction with it one continuous transaction.
The res gestae doctrine in Louisiana is broad and includes not only spontaneous utterances and declarations made before and after the commission of the crime but also includes testimony of witnesses and police officers pertaining to what they heard or observed before, during, or after the commission of the crime if the continuous chain of events is evident under the circumstances. State v. Walters, 25,587 (La.App.2d Cir [1/19/94),⅝, 630 So.2d 1371, writ denied, 95-0422 (La.6/16/95), 655 So.2d 340; State v. Oden-baugh, 2010-0268 (La.12/6/11), 82 So.3d 215, cert, denied, — U.S.-, 133 S.Ct. 410, 184 L.Ed.2d 51 (2012). Furthermore, the amount of time that elapses between the statement and the occurrence of the crime is not the sole consideration in determining whether a statement is part of the res gestae. State v. Walters, supra.
The statement at issue was made about three hours prior to the shooting and was part of the continuous transaction which led to the defendant’s shooting of his unarmed stepson. When the defendant testified, he described many events which had occurred much earlier in the day— including T.J.’s five alleged threats to kill the defendant. The trial court was correct in its analysis that the objected-to testimony fell under res gestae and that Prieur notice was not required.
The statement at issue demonstrated the defendant’s hatred of the young man and his desperate determination to rid himself of T.J.’s presence, thereby providing context to the defendant’s subsequent actions. Further, it could also be construed in the defendant’s favor, indicating that he did not necessarily plan to kill T.J. that night.
Because the trial court did not err in admitting the statement, it also did not err in denying the defendant’s motion for mistrial.
This assignment of error is without merit.
|2SHEARSAY TESTIMONY
The defendant asserts that the trial court erred in allowing Mrs. Free’s daughter, Crystal Runnels, to testify about *972 hearsay statements made by her mother during their telephone conversation on the night of the shooting.
Mrs. Runnels testified that she routinely spoke with her mother on the phone every night, and that she was speaking with her mother when the events that led to the shooting began. The defendant initially objected to Mrs. Runnels’ testimony on the grounds that it was hearsay. However, outside the presence of the jury, the court heard the testimony and concluded that it was not hearsay because Mrs. Runnels was repeating a statement that her mother had made as a witness on the previous day of trial. The court overruled the defendant’s objection. When Mrs. Runnels resumed her testimony before the jury, she recounted her mother telling her that the defendant had gotten in her face and told her he hated her as much as he hated “that boy in that room.” She testified that she also heard her brother say twice, “Bo, put the gun down.”[6] Mrs. Runnels testified that she screamed to her mother to call the police and hung up so her mother could place that call.
By the time Mrs. Runnels testified, Mrs. Free had already testified about the defendant approaching her with balled up fists and telling her he hated her as much as he hated her son. The trial court did not err in its ruling, and any error in the admission of this cumulative testimony was | 2bsurely harmless, as the jury had already heard the statement from Mrs. Free and the defendant had a full opportunity to cross-examine her.
This assignment of error is without merit.
LIMITATION ON EVIDENCE OF VICTIM’S CHARACTER
In five assignments of error, the defendant complains that the trial court unfairly limited his ability to present evidence of the victim’s character, behavior and reputation. He contends that the trial court’s rulings deprived him of his right to present a defense.
Throughout the trial, the defendant attempted to introduce evidence of T.J.’s bad character through the testimony of several witnesses. The trial court consistently ruled that evidence of specific hostile acts involving third parties could be admitted only if the defendant laid a foundation showing that the defendant had knowledge of the incidents. During the defendant’s testimony, he was allowed to testify about several such incidents.
Chris Runnels
Chris Runnels was T.J.’s brother-in-law. On cross-examination, the defense asked Mr. Runnels if he ever discussed with the defendant why T.J. was no longer living with Mr. Runnels. The prosecutor objected, citing hearsay and relevancy, and the trial judge heard the witness testify out of the presence of the jury. Mr. Runnels said that T.J. had a drug problem and “did things that he otherwise wouldn’t” when on drugs. Mr. Runnels said that T.J. was never violent, and that he never told the defendant about any altercation or hostile act involving T.J. The defense urged that it should be able to ask Mr. Runnels why T.J. was not allowed to live with him because |⅞7⅛ showed the jury that he had nowhere else to live, which was relevant to the defendant’s state of mind. The trial court refused to allow the evidence of why T.J. wasn’t allowed to live with Mr. Runnels, but did allow the defense to ask him whether T.J. was welcome to live at his home. The defense objected to the limitation, and did not recall Mr. Runnels to ask if T.J. was welcome to live with him.
*973 Ronald Carraway
The defendant asked Ronald Carraway, a mutual friend of the Frees, whether he ever had any trouble with T.J. The prosecutor objected on the grounds that this was an improper character attack on the victim. Outside the presence of the jury, the witness testified that he had once asked T.J. to leave his property because T.J. was drunk and playing loud music. However, the witness could not recall if he told the defendant about this incident. He said that he had “violent words,” or arguing, with T.J., who was “mouthy,” and that he thought he had communicated that to Mr. Free. However, the witness did not know if T.J. had been violent. The court sustained the prosecutor’s objection to this testimony given the lack of evidence of violence or that the information had been communicated to the defendant. The defendant objected to that ruling.
Jeff Free
While cross-examining Jeff Free, the defendant’s son, defense counsel elicited testimony that the witness had heard that T.J. had a reputation as a violent person. On redirect, the prosecutor elicited that Jeff Free had heard that information only from his father, so the prosecutor | masked that the witness’ remarks be stricken. The trial court granted that request and ordered that the jury disregard this evidence. The defendant did not object to this ruling.
Lynn Arnold
Lynn Arnold, the manager of the mobile home park where the shooting occurred, was asked whether he had banned T.J. from the park at one point in time. After the witness answered that he had, the prosecutor objected to the question on the grounds that it was improper evidence related to the victim’s character. Outside the presence of the jury, the witness explained that he had heard about an incident where T.J. attacked his mother, but had not witnessed it.[7] The trial court sustained the state’s objection to this evidence as hearsay. The defendant did not object to this ruling.
Law
La. C.E. art. 404 provides, in part: A. Character evidence generally. Evidence of a person’s character or a trait of his character, such as a moral quality, is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:
(2) Character of victim, (a) Except as provided in Article 412, evidence of a pertinent trait of character, such as a moral quality, of the victim of the crime offered by an accused, or by the prosecution to rebut the character evidence; provided that in the absence of evidence of a hostile demonstration or an overt act on the part of the victim at the time of the offense charged, evidence of his dangerous character is not admissible; provided further that when the accused pleads self-defense and there is a history of assaultive behavior between the victim and the accused and the accused lived in a familial or intimate ^relationship such as, but not limited to, the husband-wife, parent-child, or concubinage relationship, it shall not be necessary to first show a hostile demonstration or overt act on the part of the victim in order to introduce evidence of the dangerous character of the victim, including specific instances of conduct and domestic violence; and further pro *974 vided that an expert’s opinion as to the effects of the prior assaultive acts on the accused’s state of mind is admissible.
When a defendant attempts to present evidence of a victim’s character, it must be for a relevant purpose, such as self-defense. See La. C.E. art. 401; State v. Johnson, 41,428 (La.App.2d Cir.9/27/06), 940 So.2d 711, writ denied, 2006-2615 (La.5/18/07), 957 So.2d 150. Thus, character evidence that paints the victim as a bad person deserving his fate of death at the hands of the defendant is prohibited by La. C.E. art. 404. State v. Johnson, supra; State v. Wade, 33,121 (La.App.2d Cir.5/15/00), 758 So.2d 987, 996, writ denied, 2000-2160 (La.9/28/01), 797 So.2d 684.
A trial judge’s determination that a defendant has not laid a sufficient evi-dentiary foundation upon which to introduce testimony concerning the victim’s dangerous character will not be disturbed on appeal, absent a finding of clear error. State v. Jackson, 419 So.2d 425 (La.1981); State v. Coleman, 48,168 (La.App.2d Cir.7/17/13), 121 So.3d 703.
Discussion
A review of all the evidence and these evidentiary rulings in toto shows that the trial court carefully applied La. C.E. art. 404 and thoughtfully considered the defendant’s arguments, allowing him much latitude and leeway to introduce evidence of the victim’s violent conduct where it was properly proven. In fact, over the objections of the state, the trial court allowed the defense to include acts of violence against both the defendant |snand Mrs. Free. The specific incidents mentioned in these assignments essentially involved T. J. being intoxicated or rowdy and, as one witness put it, “mouthy.” Evidence of that character trait was plentiful throughout the trial, and the trial judge did not err in any of these rulings when the evidence simply did not satisfy the requirements of admissibility established by the rule.
Furthermore, this record is simply replete with evidence admitted about the dangerous character of T.J., his general reputation in the community, and specific threats and acts on his part toward the defendant, his mother and other third parties, including the mother of his child. The trial court was very careful and patient in ascertaining the purpose for which evidence was being offered and ensuring that the proper foundation was laid in accordance with the Louisiana Code of Evidence. In arguing these assignments, the defendant has completely ignored the tremendous amount of evidence that was properly admitted.
These assignments of error are without merit.
PREJUDICIAL REMARKS
In two assignments of error, the defendant contends that the trial court erred in allowing testimony that was irrelevant and more prejudicial than probative.
Mr. Runnels, the victim’s brother-in-law, was asked by the prosecutor to describe T.J.’s appearance in the hospital after the shooting. The defendant objected, citing relevance and La. C.E. art. 403 balance. The trial court overruled the objection. Mr. Runnels then recounted that T.J. | si appeared to be brain dead, was hooked up to a machine, and exhibited no sign of life.
La. C.E. art. 403 provides:
Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time.
*975 A trial court’s rulings as to relevancy, and balancing relevant evidence against the dangers of prejudice, will not be disturbed in the absence of a clear abuse of discretion that results in obvious prejudice to a defendant. State v. Caldwell, 504 So.2d 85B (La.1987); State v. Griffin, 618 So.2d 680 (La.App. 2d Cir. 1998), writ denied, 625 So.2d 1068 (La. 1993).
Concerning the observations of the victim by Mr. Runnels, this sort of evidence, like photos of the deceased, is commonly introduced in criminal trials because it is relevant to prove, inter alia, corpus delicti, identification of the victim and cause of death. See, e.g., State v. Maxie, 93-2158 (La.4/10/95), 653 So.2d 526, 532, fn. 8. Furthermore, the state is entitled to the moral force of its evidence. State v. Koon, 96-1208 (La.5/20/97), 704 So.2d 756, cert, denied, 522 U.S. 1001, 118 S.Ct. 570, 139 L.Ed.2d 410 (1997); State v. Magee, 2011-0574 (La.9/28/12), 103 So.3d 285, cert, denied, 12-9070, — U.S. -, 134 S.Ct. 56, 187 L.Ed.2d 49, 2013 WL 821547 (U.S.La. Oct. 7, 2013). Finally, we note that Mr. Runnels’ testimony was merely cumulative of the testimony his wife had already given; the defendant did not object to her testimony on this matter.
The defendant also complains about the testimony elicited from Officer Tayonna Jackson, one of the responding police officers, about the [^defendant's demeanor immediately after the shooting. She described him as “in shock.” The prosecutor asked the officer whether the defendant showed any grief, and the defense objected on the grounds that the question had been asked and answered. The court overruled that objection, and the officer answered that in her opinion, the defendant did not show any grief or ask about the victim’s condition and that she personally outwardly expressed more grief than the defendant did. She again said she thought he was in shock.
In order to preserve an issue for appellate review, a party must state an objection contemporaneously with the occurrence of the alleged error, as well as the grounds for the objection. La. C. Cr. P. art. 841(A). It is well established that a defendant is limited to the grounds for objection articulated at trial and a new basis for an objection may not be raised for the first time on appeal. State v. Delaney, 42,990 (La.App.2d Cir.2/13/08), 975 So.2d 789. Because the defendant did not raise a relevance or prejudice objection to the officer’s testimony at trial, he is precluded from raising that basis for objection on appeal.
These assignments of error are without merit.
NONRESPONSIVE TESTIMONY
The defendant argues that the trial court erred in failing to strike the non-responsive testimony of Detective Kevin Strickland and refusing to instruct him to answer only the question asked.
During cross-examination, the detective was shown photos of the injuries sustained by the defendant in his chair-throwing altercation with |aaT.J. in January 2010. When asked if he knew if T.J. had been convicted as a result of inflicting the injuries upon the defendant, Detective Strickland responded:
Information did come to light that Mr. Free started that incident and should have been the one arrested.
Defense counsel immediately objected and asked that the nonresponsive response be stricken. The court overruled the objection, and invited the defense to rephrase the question, which counsel did without further objection. Subsequently, when asked whether he had any document from the district attorney’s office indicating that *976 T.J. should not have been convicted, the detective responded:
No. Just my review of the investigation and statements made by Mr. Free.
Counsel asked the trial court to instruct the witness to answer the question posed and only the question, and the trial judge overruled the objection.
On appeal, the defendant argues that these rulings were in error because the detective’s answers were not responsive to the questions and the answers were unduly prejudicial. Although the detective’s responses were nonresponsive to a degree, the information the officer supplied was based upon his own investigation. Moreover, the jury heard evidence from the defendant himself about the details of the January 2010 encounter with T.J. Any prejudice which may have been created by the officer’s responses was negated by the defendant’s ability to tell the jury about that event.
Any error by the trial court in these rulings was harmless beyond a reasonable doubt, and this assignment of error is without merit.
J^CONDUCT OF PROSECUTOR
In this assignment, the defendant criticizes the “disturbing” tone of the prosecutor’s cross-examination during the defendant’s testimony and argues that the trial court erred by allowing the prosecutor to badger the defendant with repetitive questions. Among the seven complained of questions were the following:
“You mean you don’t remember whether you ever threatened to kill someone?”
‘You don’t feel the least bit of shame in calling this deceased boy a monster?”
“What’s a 59-year-old man doing throwing] a chair at a 19-year-old boy? Can you answer me that?”[8]
Although the defendant recites the instances in brief, he presents essentially no argument about how these questions were unfairly prejudicial or why they should have been interrupted by the trial judge. Nor is there any significant argument that the prosecutor’s questioning somehow created a reversible error. Typically, such prosecutorial arguments and remarks are tempered by “the good sense and fair-mindedness of the jury.” State v. Eaton, 524 So.2d 1194, 1208 (La.1988), cert, denied, 488 U.S. 1019, 109 S.Ct. 818, 102 L.Ed.2d 807 (1989).
This assignment of error is without merit.
^INSTRUCTING DEFENDANT TO ANSWER
The defendant claims that the trial court erred in instructing him to answer a specific question, which he had already answered, directly related to an element of the state’s burden of proof.
During the defendant’s testimony, there were several instances when he failed to answer the question posed to him. At one point, the prosecutor asked the defendant whether he intended to do great bodily harm to the victim. The defendant attempted to answer the question by saying that he intended to stop T.J. by hitting (shooting) him, but the prosecutor did not accept that answer and, at the prosecutor’s request, the court directed the defendant to “listen to the question and respond to the question.” The prosecutor again asked the defendant if he intended to do great bodily harm to the victim, and the defendant answered, ‘Yes.”
The defendant complains about this incident on appeal, but the record reflects that *977 no contemporaneous objection was raised to the prosecutor’s question at trial. See La. C. Cr. P. art. 841(A). Thus, the matter is waived on appeal. However, assuming arguendo that it was properly before us, any error was harmless.
PREJUDICIAL COMMENTS BY PROSECUTOR
In this assignment of error, the defendant complains of “numerous prejudicial comments” by the prosecutor in front of the jury and the trial court’s failure to instruct the jury to disregard the comments. In his initial listing of his assignment of errors in his brief, he merely enumerates 271 ¡^different transcript pages under this assignment of error.[9] However, in his brief, he makes a vague one-page argument in which he complains that various comments from the prosecutor throughout the trial were “unprofessional and inaccurate.” He cites no supporting jurisprudence and mentions one instance in which the trial court admonished both the prosecution and defense counsel to “calm down.”[10]
A mere statement of an assignment of error in a brief does not constitute briefing of the assignment, and therefore, the assignment is deemed abandoned. State v. Scott, 27,104 (La.App.2d Cir.6/21/95), 658 So.2d 251, writ denied, 97-2049 (La.2/13/98), 706 So.2d 990.
This assignment of error lacks merit.
DENIAL OF MOTION FOR NEW TRIAL
The defendant contends that the trial court erred in denying his motion for new trial. The issues raised in the motion were: insufficient evidence, non-unanimous jury, and the trial court’s refusal to allow evidence of the defendant’s post-shooting relationship with his wife. The first and last of these issues have been addressed swpra.
The constitutionality of La. C. Cr. P. art. 782, which permits conviction by a non-unanimous jury, has been consistently upheld in this state. See State v. Barnett, 46,303 (La.App.2d Cir.5/18/11), 70 So.3d 1, | ¡f/unit denied, 2011-1612 (La.4/13/12), 85 So.3d 1239, and all of the cases cited therein.
This assignment of error is meritless.
EXCESSIVE SENTENCE
The defendant complains that the trial court erred in imposing the mandatory sentence of life imprisonment for second degree murder because he had no criminal history and significant health issues.
No motion to reconsider sentence was filed. Therefore, the defendant is only entitled to review of his sentence for constitutional excessiveness. State v. Mims, 619 So.2d 1059 (La.1993); State v. Duncan, 47,697 (La.App.2d Cir. 1/16/13), 109 So.3d 921, writ denied, 2013-0324 (La.9/13/13), 120 So.3d 280.
Although the Louisiana Supreme Court has held that courts have the power to declare a mandatory minimum sentence excessive under Art. I § 20 of the Louisiana Constitution, this power should be exercised only in rare cases and only when *978 the court is firmly convinced that the minimum sentence is excessive. State v. Jefferson, 47,009 (La.App.2d Cir.3/7/12), 91 So.3d 1007, writ denied, 2012-0751 (La. 11/2/12), 99 So.3d 661.
The assertion that the mandatory life sentence for second degree murder is a violation of the prohibition against excessive punishment in the Louisiana Constitution has been repeatedly rejected. State v. Jefferson, supra; State v. Bryant, 29,344 (La.App.2d Cir.5/7/97), 694 So.2d 556; State v. Parker, 416 So.2d 545 (La.1982).
| ssThe factors asserted by the defendant — lack of a criminal record and poor health — are inadequate to show that the mandatory sentence for second degree murder is inappropriate for him.
This assignment of error lacks merit.
CONCLUSION
The defendant’s conviction and sentence are affirmed.
AFFIRMED.

. The defendant, who is now represented by the Louisiana Appellate Project after having been represented by retained counsel at trial, filed a motion to file a pro se brief. The brief was not filed timely and his motion for an extension of time in which to file was denied by this court. Accordingly, his pro se brief will not be considered. However, we note that all six of the pro se assignments of error were repetitive of those asserted by his appellate counsel.

. The first paragraph reproduces the substance of La R.S. 14:20(D), while the second paragraph contains that of La. R.S. 14:20(C). These section were added to the statute when it was amended by Acts 2006, No. 141.
Prior to the amendment, the statute provided that a homicide shall be justifiable even though the person committing the homicide does not retreat from the encounter in situations involving a home burglary or robbery or an attempt to make an unlawful entry into a dwelling, business or vehicle.

. After reviewing the evidence presented to the jury, the court in Ingram upheld the jury's conclusion that the defendant’s choice to shoot the victim was unjustified. The appellate court found that the evidence — which included testimony that the defendant was angry with the victim about their community property settlement and his recorded statements to the 911 operator that the victim was unarmed to his knowledge but that he was going to have to "do something” if she came in the house — was sufficient to prove beyond a reasonable doubt that the use of deadly force under the circumstances was unreasonable and that the defendant was guilty of manslaughter.

. To our knowledge, the Louisiana Supreme Court has not addressed this issue. Without discussion, this court has mentioned the "possibility of escape" language. See State v. Brooks, 47,394 (La.App.2d Cir. 12/12/12), 108 So.3d 161, fn. 6, writ denied, 2013-0080 (La.5/31/13), 118 So.3d 393, which concerned a 2009 shooting.
The fifth circuit stated in State v. Vedol, 12-376 (La.App. 5th Cir.3/13/13), 113 So.3d 1119, 1124, that despite La. R.S. 14:20(D), it "has continued to recognize that while there *970 is no unqualified duty to retreat from an altercation, the possibility of escape is a recognized factor in determining whether or not a defendant had a reasonable belief that deadly force was necessary to avoid the danger.” That case involved a 2009 shooting.
In State v. Hardy, 2011-267 (La.App.3d Cir.10/5/11), 72 So.3d 1017, -writ denied, 2011-2386 (La.3/9/12), 85 So.3d 690, the facts of which arose after the 2006 amendment, the third circuit still favorably cited the "possibility of escape” language.
We note that the authors of a treatise on Louisiana jury instructions suggest that the following instruction be given on the issue of retreat when instructing a jury on self-defense in a homicide case:
There are several factors that you should consider in determining whether the defendant had a reasonable belief that the killing was necessary to save himself [herself] from that danger:
(1) the possibility of avoiding the necessity of taking human life by retreat, provided however, that a person who is not engaged in any unlawful activity and is in a place where he or she has a right to be has no duty to retreat before using deadly force to save himself [herself] from the danger of losing his [her] life or receiving great bodily harm. He [she] may stand his ground and meet force with force....
Cheney C. Joseph & P. Raymond Lamonica, Criminal Jmy Instructions, § 6.18, 17 La. Civil Law Treatise (3d ed.2012). This edition may not have been available when this case was tried.

. An improper jury instruction on self-defense is subject to harmless error analysis. State v. Glover, 47,311 (La.App.2d Cir. 10/10/12), 106 So.3d 129, 138, writ denied, 2012-2667 (La.5/24/13), 116 So.3d 659. The harmless error analysis evaluates whether the guilty verdict actually rendered in the trial was surely unattributable to the error. State v. Glover, supra.

. "Bo” is the defendant’s nickname.

. Testimony about this attack was allowed during the testimony of a neighbor who had witnessed the incident.

. We note that the cited questions included one (“Two scars for the rest of your life?”) where the trial court sustained a defense objection.

. Examination of these 27 instances fails to reveal contemporaneous objection to the overwhelming majority of these comments, most of which may be described as innocuous.

. It is noteworthy that after the jury retired to deliberate, the trial court thanked each side for doing an "excellent, excellent job,” while observing that they all “[g]ot a little irritable sometimes.”