Judgment rendered October 1, 2025.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 56,426-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                          Appellee

versus

KENMICCAEL DANO RAY                         Appellant

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 389,215

Honorable Ramona L. Emanuel, Judge

* * * * *

LOUISIANA APPELLATE PROJECT          Counsel for Appellant
By: Christopher A. Aberle

JAMES E. STEWART, SR.                Counsel for Appellee
District Attorney

TOMMY J. JOHNSON
RON C. STAMPS
ALEX L. PORUBSKY
Assistant District Attorneys

* * * * *

Before COX, STEPHENS, and THOMPSON, JJ.

**THOMPSON, J.**

The innocent young life of 13-year-old eighth-grade student, Landry Anglin, was tragically cut short when one of several bullets fired by the defendant from a vehicle on the street entered through a window of the home and struck and killed her. It was discovered the defendant fired several rounds from his weapon at another vehicle near the residence, which then initiated a rolling shoot-out on the quiet, residential street in Shreveport, Louisiana. The defendant fled the scene but was arrested days later in Arlington, Texas, still in possession of the weapon used in this shooting. After his arrest, the defendant changed his story multiple times and ultimately only admitted to his involvement in the shooting and firing the first shots when confronted with overwhelming evidence. The bullet that killed Landry was conclusively determined to have been fired by the defendant, and he was charged with second degree murder during an assault by drive-by shooting.

After a five-day jury trial, the defendant was found guilty of second degree murder and received the mandatory life sentence without benefit of probation, parole, or suspension of sentence. He now appeals his conviction and sentence, asserting: (1) that there was insufficient evidence that he did not act in self-defense from others when he fired the shot that killed Landry because he feared for his own life and that of his young daughter; (2) that the jury should had been instructed on his self defense claim; and (3) that there are errors in the trial transcript from the reading of the jury's verdict which entitle him to a new trial. For reasons more fully detailed below, we affirm Ray's conviction and sentence.

## FACTS AND PROCEDURAL HISTORY

On May 1, 2022, Landry Anglin ("Landry"), age 13, along with her brother, Cole, their mother, Michelle Anglin, and Michelle's partner, Tim Brannon ("Tim"), were in Tim's parents' home at in the 4500 block of Fairfield Avenue, in Shreveport, Louisiana, when a bullet came through the window, striking and killing Landry. It is undisputed that defendant, Kenmiccael Dano Ray ("Ray"), fired the shot that killed Landry as part of a burst of gunfire directed toward another vehicle behind him on Erie Street, and between him and the house in which Landry was located near the intersection of Erie Street and Fairfield Avenue. After the shooting and resulting police pursuit, Ray fled to Texas but was arrested five days later on a weapons charge. Ray was returned to Louisiana, arrested, and charged with second degree murder for the killing of Landry. The matter eventually proceeded to a five-day jury trial, which began on June 10, 2024. The testimony and evidence presented at the trial established the following pertinent facts:

On the day of the shooting, Ray was riding in the passenger seat of a gold Chevy Cavalier being driven by his friend, Gavontay Johnson. Ray's three-year-old daughter was also in the vehicle with the two men. The record shows that while traveling down Erie Street in Shreveport, Ray leaned out the window and fired his Kel-Tec .223/5.56 caliber rifle toward a white Chrysler 300 vehicle that was driving approximately one block behind him near the intersection of Erie Street and Fairfield Avenue. No one in the Chrysler 300 had fired a weapon at the vehicle in which Ray was riding or provoked Ray to shoot at them. 19 shell casings in all from Ray's weapon were recovered by the Shreveport Police, 12 of which were from the initial

burst of gunfire that included the bullet that killed Landry. After Ray shot at the Chrysler, the driver pulled that vehicle into a driveway on Erie Street across from South Highlands Elementary School, returned fire, and drove away, turning onto Thornhill Avenue. What has been described as a rolling gun battle ensued.

Landry's mother, Michelle, testified at trial that Landry was in a celebratory mood that day, having just had her braces removed. At around 2:00 PM, Landry was admiring a zebra rug located in an office in the house, when suddenly, a loud pop rang out and Landry bent over and spoke her last words, "Help me." Michelle noticed a small hole in Landry's lower back and shortly thereafter noticed a small hole in the window. Landry never regained consciousness. Lifesaving efforts by Dr. Michael Brannon, Tim's father and the owner of the home, were to no avail. Tim dialed 911 requesting emergency medical assistance, but tragically, Landry did not survive the gunshot injury.

Detective Jason Booze with the Shreveport Police Department (hereinafter "SPD") responded to the shooting. Det. Booze testified that he was the patrol officer on duty in the area at the time of the shooting. He testified that he responded to a multiple shots call while he was northbound on Line Avenue. Just before Det. Booze turned left onto Erie Street heading west from Line Avenue, he was advised of an EMS call at Fairfield Avenue and Erie Street. Near the 800 block of Erie Street, Det. Booze testified that he observed multiple citizens coming out of their homes and standing in their front yards. The citizens reported multiple shell casings on their street, all the way down Erie Street, through the end of the 900 block, where Erie Street intersects at Fairfield Avenue. At the

3

intersection, Det. Booze saw Tim Brannon running and waving his arms. Det. Booze stopped, and Tim escorted him inside the home. There, he observed Landry on the floor in the office receiving CPR from the homeowner, Dr. Brannon. Looking out the window, Det. Booze noticed what looked like a single gunshot hole in the glass. Det. Booze testified that he notified detectives, and crime scene investigators soon responded to the scene.

The SPD investigation developed the involvement of four vehicles in the events leading up to the shooting on Erie Street, followed by a shooting in the 900 block of Mitchell Lane six minutes later. The vehicles involved were a gold Chevy Cavalier, a silver Chrysler 200, a white Chrysler 300 on Erie Street, and a black Dodge Charger,[1] which arrived on Mitchell Lane. Ray was a front seat passenger in the gold Chevy Cavalier. Keara Russell operated the silver Chrysler 200 closely behind the Cavalier. The drivers of the white Chrysler 300 and the black Dodge Charger were unknown on the day of the shooting.

SPD Crime Scene Investigative Officer Christopher Collins testified that he responded to the crime scene at Fairfield Avenue and Erie Street and gathered evidence including photographs of Landry, photographs of the scene of the house, Erie Street shell casings, and the gold Chevy Cavalier, which was recovered on Mitchell Lane after patrol officers in the area identified it from its involvement in the shoot-out. Officer Collins also collected numerous expended shell casings and projectiles from multiple weapons, including .223/5.56 spent shell casings from Ray's Kel-Tec

---

[1] The black Dodge Charger never appeared on Erie Street.

4

weapon and a separate Kel-Tec weapon, as well as 9 mm spent shell casings. The first 12 shell casing markers Officer Collins identified were determined to be a ballistic match to the Kel-Tec weapon used by Ray.

Video footage from multiple surveillance cameras located at private homes in the area, as well as South Highlands Elementary School, was introduced into evidence at trial, capturing numerous perspectives of the events. The video footage showed that the white Chrysler 300 was approximately one block behind the gold Chevy Cavalier when Ray fired the first shot (and then several more). Video footage from a house across the street from South Highlands Elementary School depicted Ray leaning out the front passenger window while shooting in the direction of the house on Fairfield, in which Landry was visiting, as well as the white Chrysler 300. The gunfire from Ray caused the white Chrysler 300 to turn into the driveway of a house in the 800 block of Erie Street. The white Chrysler 300 then returned fire from the driveway toward the vehicle in which Ray was riding.

After the shoot-out on Erie Street, the vehicles made their way to the 900 block of Mitchell Lane. At that point, the fourth vehicle, a black Dodge Charger, approached. Individuals from the black Dodge Charger shot at the gold Chevy Cavalier and a barbershop and then drove away. Ray and the driver, Johnson, exited the gold Chevy Cavalier, were picked up by another vehicle, and left the scene.

The police investigation led to Arlington, Texas, when, on May 6, 2022, five days after the shooting, Ray was arrested during a vehicle stop in Arlington on an illegal use of a weapon charge. Ray's Kel-Tec rifle, .223/5.56 caliber, was recovered from the tire well of the vehicle in which he

5

was riding. Phillip Stout, the firearm section supervisor for the North Louisiana Crime Lab, testified that he tested Ray's Kel-Tex rifle that was recovered in Arlington, and established through ballistics testing that the bullet that struck and killed Landry was fired from Ray's Kel-Tec rifle.

Dr. James Traylor, a forensic pathologist, performed Landry's autopsy and prepared an autopsy report. Dr. Traylor testified at trial that Landry died from a gunshot wound entering the upper left buttocks, injuring the left kidney, the left adrenal gland, the thoracic aorta, the ninth thoracic vertebral level, and perforated the lower lobe of her right lung, resulting in hemorrhage into the right pleural space where the lung is housed. Dr. Traylor reported Landry's manner of death was homicide.

Detective Montreal Jackson was the lead SPD detective on the case. Detective Jackson testified that he interviewed Ray on May 7, 2022, in Arlington. Detective Jackson testified that Ray initially denied firing shots on Erie Street, but later in this interview admitted to firing the Kel-Tec but claimed he did not fire it first.

SPD Detective Adam McEntee conducted a second interview with Ray on May 19, 2022. During the early part of the interview, Ray admitted the weapon he was firing at the white Chrysler 300 on Erie Street was the Kel-Tec. Ray also acknowledged he was affiliated with a street gang identified as "Three Babies." Ray stated the shooting on Erie Street was the first shooting of that day, and no shots were fired before this shooting. Further, Ray still claimed the person or persons in the white Chrysler 300 fired first. The surveillance audio and video and testimony contradicted Ray's assertions.

Detective McEntee testified at trial that he did not believe Ray's initial statement that he did not fire until after he had been fired upon, based on surveillance footage, the placement of evidence on scene, the type and caliber of shell casings observed on Erie Street, and the location of those shell casings. During the interview, when confronted with the evidence against him, Ray eventually admitted he shot first, claiming the white Chrysler 300 was directly behind him when he started shooting. Ray stated he was trying to back the white Chrysler 300 off and scare them away. Finally, Ray revealed the truth: that he shot first, and the individuals in the white Chrysler did not start shooting until he had finished shooting.

Det. McEntee testified that the physical evidence corroborated Ray's revised statement that he had in fact fired his weapon first. The video footage from Fairfield Avenue showed the gold Chevy Cavalier traveling south with the silver Chrysler 200 close behind. Then, the white Chrysler 300 appeared approximately 10 to 12 seconds behind. Det. McEntee noted the audio from the video footage presented the distinctive sound of a .223/5.56 rifle round being fired and then more rifle rounds. Later in the video footage, the exchange of gunfire is heard. Det. McEntee described the video footage from South Highlands Elementary School, depicting Ray hanging out the window, firing his weapon, and showing the bullets hitting around the trees and impacting the dirt. Det. McEntee testified that the firing of those rounds occurred before the Chrysler 300 slowed and turned into the driveway on Erie Street. Det. McEntee also confirmed what the video footage depicted – that all the rounds fired from the individuals in the Chrysler 300 were fired from the driveway and sidewalk on Erie Street. Det. McEntee confirmed that his investigation revealed one of the bullets

7

was fired by Ray from his Kel-Tec .223/5.56 weapon during this drive-by shooting killed Landry Anglin.

At trial, Ray testified in his own defense. Ray responded "no" when his attorney questioned whether he had the intent to fire into the residence on Fairfield Avenue. Under cross-examination, Ray admitted to firing the Kel-Tec weapon at least 12 times. Although he claimed he fired the weapon to protect his daughter while hanging out a window of a moving vehicle, he did not explain how firing first provided her protection when he did not know who was in the white Chrysler 300. Ray testified he wanted to scare the occupants of the Chrysler 300.

On June 14, 2024, the jury trial concluded after five days of testimony and evidence, and the 12 jurors retired to consider their verdict while the two alternate jurors were instructed by the court to remain in the courtroom. Following approximately 55 minutes of deliberations, the members of the jury returned and announced their unanimous verdict of guilty of second degree murder during an assault by drive-by shooting. The State requested the polling of the jury. After the polling of the jury, the court held a sidebar conference with the State and the defense. Both sides reviewed the 12 written and signed jury verdict forms after the polling. The defense entered no objection to the form or manner of the returning of the jury verdict, and the verdict forms were sealed and made part of the record. Motions for new trial and post-verdict judgment of acquittal were denied.

On July 26, 2024, Ray was sentenced, following victim impact statements by Landry's parents. The court sentenced Ray to the mandatory sentence of life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence. Ray now appeals.

## DISCUSSION

At the outset, it is appropriate to address the nature of the charges filed against Ray. Second Degree Murder, as defined in La. R.S. 14:30.1(A)(1), is the killing of a human being when an offender has a specific intent to kill or to inflict great bodily harm. It was not alleged that Ray had specific intent to kill Landry. However, the statute continues, in La. R.S. 14:30.1(A)(2), to include the killing of human being when an offender is engaged in the perpetration or attempted perpetration of several enumerated crimes, one of which is assault by drive-by shooting. La. R.S. 14:37.1 defines Assault by Drive-By Shooting as an assault committed with a firearm when the offender uses a motor vehicle to facilitate the assault. Ray was charged with second degree murder under this provision because Landry was killed because Ray engaged in the perpetration of an assault by drive-by shooting, as will be discussed in greater detail below.

On appeal, Ray asserts three assignments of error: (1) the state failed to prove his guilt beyond a reasonable doubt that he did not act in self-defense; (2) that the court erred in not instructing the jury about Ray's self-defense claim; and (3) that the record appears to indicate Ray was prejudiced by alternate jurors being allowed to participate in jury deliberations. We will address each of these asserted assignments of error below.

**Assignment of Error No. 1: The State failed to prove beyond a reasonable doubt that Ray did not act in self defense when he shot Anglin. Ray justifiably feared for the life and the safety of himself and his 3-year-old daughter as three cars chased and fired at the car in which he and his 3-year-old daughter were passengers. Ray's statement, his testimony, video surveillance, and physical evidence all were consistent with Ray's self defense claim. Given such evidence, the State failed to prove beyond a reasonable doubt that Ray was guilty of Second Degree Murder during an Assault by Drive-By Shooting.**

9

Ray argues that on the day Landry died, he and his three-year-old daughter were passengers in a car that was being pursued by another vehicle, and that the drivers and passengers of that car were intent on killing him or causing great bodily harm to him, his daughter, and the driver of his vehicle. Ray asserts that the car in which he and his daughter were passengers was found riddled with bullets on Mitchell Lane, confirming that Ray was correct to fear for his life and the life of his daughter. He further argues that when he fired the shot that accidentally struck and killed Landry, he did so in self-defense and did not fire a single round with criminal intent. Therefore, Ray argues that the State failed to prove beyond a reasonable doubt that he committed second degree murder during an assault by drive-by shooting.

The standard of review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State v. Tate*, 01-1658 (La. 5/20/03), 851 So. 2d 921, *cert. denied*, 541 U.S. 905, 124 S. Ct. 1604, 158 L. Ed. 2d 248 (2004); *State v. Grimble*, 51,446 (La. App. 2 Cir. 7/5/17), 224 So. 3d 498. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. *State v. Dotie*, 43,819 (La. App. 2 Cir. 1/14/09), 1 So. 3d 833, *writ denied*, 09-0310 (La. 11/6/09), 21 So. 3d 297. The appellate court does not assess the credibility of witnesses or reweigh evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So. 2d 442. A reviewing court accords great deference to a jury's

10

decision to accept or reject the testimony of a witness in whole or in part. *State v. Eason*, 43,788 (La. App. 2 Cir. 2/25/09), 3 So. 3d 685, *writ denied*, 09-0725 (La. 12/11/09), 23 So. 3d 913.

The *Jackson* standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of the evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstantial evidence must be sufficient for a rational trier of fact to conclude, beyond a reasonable doubt, that the defendant was guilty of every essential element of the crime. *State v. Sutton*, 436 So. 2d 471 (La. 1983); *State v. Hampton*, 52,403 (La. App. 2 Cir. 11/14/18), 261 So. 3d 993, *writ denied*, 19-0287 (La. 4/29/19), 268 So. 3d 1029. Circumstantial evidence is defined as evidence of facts or circumstances from which one might infer or conclude the existence of other connected facts. *Hampton, supra*. Direct evidence provides proof of the existence of a fact, for example, a witness's testimony that he saw or heard something. Circumstantial evidence provides proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. *State v. Lilly*, 468 So. 2d 1154 (La. 1985); *Hampton, supra*.

La. R.S. 14:30.1(A)(2) provides, in pertinent part, that second degree murder includes the killing of a human being "[w]hen the offender is engaged in the perpetration or attempted perpetration of assault by drive-by shooting, **even though he has no intent to kill or to inflict great bodily harm**." (Emphasis added). While Ray may not have intended to kill

11

Landry, such intent is not necessary to prove second degree murder in this instance. The evidence clearly established that Ray had the requisite intent to commit an assault by drive-by shooting. Although Ray claims self defense, and testified he was only attempting to frighten away the people in the vehicle he shot at, his actions fall squarely in the definition of assault by drive-by shooting. La. R.S. 13:37.1(C) defines the term "drive-by shooting" as the discharge of a firearm from a motor vehicle on a public street, highway, or interstate highway with the intent either to kill, cause harm to, **or frighten another** person. (Emphasis added). Ray discharged his weapon from a motor vehicle on a public street with the admitted intent to frighten another person and he killed a human being as a result. These actions are the very definition of the crime.

In further considering Ray's claim of acting in self defense, La. R.S. 14:21 provides: "A person who is the aggressor or who brings on a difficulty **cannot** claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict." (Emphasis added)

When a defendant claims self-defense, the State has the burden of establishing beyond a reasonable doubt that he did not act in self-defense. *State v. Harris*, 26,411 (La. App. 2 Cir. 10/26/94), 645 So. 2d 224. Factors to consider in determining whether a defendant had a reasonable belief that the killing was necessary are the excitement and confusion of the situation, the possibility of using force or violence short of killing, and the defendant's knowledge of the assailant's bad character. *State v. Free*, 48,260 (La. App. 2 Cir. 11/20/13), 127 So. 3d 956, *writs denied*, 13-2978 (La. 5/30/14), 140 So. 3d 1174 *and* 14-0039 (La. 9/19/14), 148 So. 3d 944.

Ray's claim of self defense is belied by the fact it was he who initiated the confrontation, introduced firearms into that confrontation, and fired the first 12 shots. The record established that Ray did not even know who was in the vehicle at which he shot, and that he had not seen a weapon from the other vehicle before he opened fire, unleashing a hail of gunfire. Ray's action as the aggressor negates satisfying any minimal threshold to legitimately assert self defense to avoid the tragic consequences of his criminal behavior. Ray's introduction of a deadly weapon into this situation allowed the jury to reasonably conclude that Ray assumed the role of an aggressor, prohibiting him from a claim of self-defense. *State v. Miller*, 37,472 (La. App. 2 Cir. 3/3/04), 868 So. 2d 239.

Viewing the evidence in the light most favorable to the prosecution, we conclude the State presented sufficient evidence for a reasonable trier of fact to convict Ray of second degree murder. Ray's arguments on appeal are based on his own statements to police and his trial testimony. However, Ray made multiple misrepresentations to police during their investigation, with his story changing numerous times over the course of his police interviews and trial.

Notably, Ray initially lied about the fact he fired his weapon the day Landry died. Ray also lied about the location of the Chrysler 300 when he started shooting. The vehicle was approximately one block behind him – the vehicle was not right on his tail as he asserted. Ray initially lied about who fired the first shots. The excitement in this matter occurred when Ray fired the first shots. Without the knowledge of who was in the white Chrysler 300, Ray lacked any knowledge of an assailant's bad character or if an assault was going to occur before he opened fire. Ray sought no assistance

13

at any time from law enforcement to avoid the use of violence. Ray's misrepresentation of the facts, as well as his flight to Texas, allowed for an inference of a guilty mind by the jury. All of these factors support the finding that Ray did not have a reasonable belief that he was in imminent danger of losing his life or receiving great bodily harm when he fired the first shots.

In summary, Ray could not have the reasonable belief that he was in imminent danger of losing his life or receiving great bodily harm when he fired the first shot at a vehicle that was one block away. Ray's alleged intent to scare the occupants of the White Chrysler 300 by shooting at them proved he acted with the necessary criminal intent to commit an assault by drive-by shooting, which caused the death of Landry. The fact Ray claims he intended to scare the occupants of the Chrysler 300 by shooting from a motor vehicle proved he acted with the necessary criminal intent to commit an assault by drive-by shooting. The evidence proved Ray fired the shot that killed Landry. Viewing the evidence in light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, and that the homicide was not committed in self-defense. This assignment of error is without merit.

**Assignment of Error No. 2: Ray argued that he justifiably feared for the life and the safety of himself and his 3-year-old daughter as three cars chased and fired at the car in which he and his 3-year-old daughter were passengers. Indeed, Ray's statement, his testimony, video surveillance, and physical evidence all were consistent with Ray's self defense claim. Given such evidence, the trial court erred when it refused to instruct the jury on Ray's self defense claim and such error was not harmless.**

In his second assignment of error, Ray argues that the law and evidence in this case supported his timely request that the jury be instructed

14

on the law of self-defense. Ray asserts that the trial court erred when it refused to instruct the jury on self defense, and that there was evidence before the jury to support his claim that he felt there was an immediate and real threat of death or great bodily harm to him and his daughter. Ray further asserts there was sufficient evidence upon which to instruct the jury on his self defense claim, and that a reasonable juror could have found that the facts established a reasonable hypothesis of innocence – that he did not act with the requisite criminal intent. Ray also argues he did not act with criminal intent to discharge his firearm from a motor vehicle on a public street, highway, or interstate highway with the intent to kill, cause harm to, or frighten another person, and he did not act with the criminal intent to use a motor vehicle to facilitate an assault.

The record shows that the defense did not submit any written requested charges to the trial court, nor was a copy provided to opposing counsel. Following a conference with counsel and the trial court, the defense orally requested a special charge to the jury pertaining to justifiable homicide. The trial court denied the oral request, noting the request was not in accordance with law. A court is within its proper authority to deny a request for a special charge when not presented in writing. *State v. Weems*, 358 So.2d 285 (La. 1978).

La. C. Cr. P. art. 802 provides that the court shall charge the jury "as to the law applicable to the case." However, a special written charge need not be given if it requires qualification, limitation, or explanation, and if it is wholly correct and pertinent. La. C. Cr. P. art. 807; *State v. Telford*, 384 So. 2d 347 (La. 1980); *State v. McDuffey*, 42,167 (La. App. 2 Cir. 6/20/07), 960 So. 2d 1175. The charge must be supported by the evidence, because

15

the trial court is not obligated to instruct the jury on abstract principles of law. *Telford, supra.*

As noted above, with Ray acting as the aggressor, the evidence did not support a claim of self-defense; therefore, a special charge on self-defense is not appropriate in this case. The defense's oral request required further qualification, limitation, and explanation in light of Ray's role of an aggressor and his perpetration of an assault by drive-by shooting. The defense did not submit any written requested charges to the court, nor was a copy provided to the State. La. C. Cr. P. art. 807 requires special written charges for the jury, and that a copy be furnished to the other party. We find the trial court correctly denied the oral request and conclude this assignment of error is without merit.

**Assignment of Error No. 3: The transcript indicates that all fourteen (14) jurors, including the two (2) alternate jurors, responded that the guilty verdict was their verdict. If, as the record on appeal appears to indicate, the alternate jurors participated in deliberations and returned a verdict, such participation in the deliberations and in the returning of a verdict would be an extraneous influence on the jury representing a prima facie case of prejudice requiring reversal.**

Ray argues that the transcript of the trial indicates that all 14 jurors, including the two alternate jurors, responded affirmatively that the guilty verdict was their verdict. Ray argues that *if* the alternate jurors participated in deliberations and in the returning of a verdict, such participation would be an extraneous influence on the jury representing a *prima facie* case of prejudice requiring reversal. The transcript and jury verdict forms indicate there was no participation by alternate jurors in deliberations or the finding of the jury.

Generally, an alternate juror's participation in jury deliberations constitutes an extraneous influence on the jury which establishes a *prima facie* case of prejudice to the defendant and constitutes reversible error. *See State v. Howard*, 573 So. 2d 481 (La. 1991). A verdict returned by a jury composed of either more or less than the correct number of jurors is null and void. *State v. Smith*, 367 So. 2d 857 (La. 1979); *State v. Nedds*, 364 So. 2d 588 (La. 1978). An error in the size of a jury is discoverable on the face of the record *ex proprio motu* without formal objection under La. C. Cr. P. art. 841 or assignment of error. *Smith, supra.*

A thorough review of the entire record provides that the alternate jurors did not participate in deliberations, and no error occurred. The record reveals the court ordered the alternate jurors to remain in the courtroom before ordering the 12 jurors to retire to the jury room to consider their verdict:

> THE COURT: To the alternate jurors, you're to remain in the courtroom. Ladies and gentlemen of the jury, no notes are to be taken into the jury room, and you should not discuss the case with anyone other than your fellow jurors. You may retire to the jury room to consider your verdict.

The jury later returned to the courtroom with a verdict, after deliberations. The foreperson announced to the court the return of a verdict. The trial court announced the verdict and inquired, "Ladies and gentlemen, is this your verdict?" The transcript includes a list of the names of all jurors, including the two alternatives, with "yes" as their response to the question regarding their verdict. The State requested a polling of the jury, and the jury was polled. Following the polling of the jury, the trial court ordered a representative of the State and defense to a sidebar for discussion. There were 12 verdict forms which had been presented to each of the jurors to sign

17

and indicated whether the verdict was in fact their verdict. All 12 jurors signed their own individual form, those forms were ordered sealed, and the court noted: "Both sides have reviewed those forms." There was no objection by the State or the defense to the jury verdict forms. There were only 12 forms, one for each of the final jurors:

> THE COURT: The Court is ordering that the verdict forms be filed under seal in accordance with law. Both sides have reviewed those forms. Madam Clerk, please make those proper filings. I'm going to ask the jurors to remain seated for the moment.

La. C. Cr. P. art. 812 provides that the written polling slips are the **official record of the verdict of the jury**. Although the transcript reflects that a polling of the jury took place, the *official record* – the polling slips – proves only the 12 jurors that retired to deliberate the case returned the verdict. Additionally, the transcript reflects the trial court instructed the alternate jurors to remain in the courtroom while the 12 jurors were escorted out of the courtroom to begin their deliberations. The same 12 jurors each signed a jury verdict form, which are a part of the record.

Accordingly, we find that the record is devoid of any positive proof that the alternate jurors participated in the jury deliberation. To the contrary, a careful reading of the entire record indicates the alternates did not participate in jury deliberations. Thus, we find that there is no need to remand this case for an evidentiary hearing on the matter, as Ray requested. This assignment of error is without merit.

## CONCLUSION

For the foregoing reasons, we affirm Kenmiccael Dano Ray's conviction of second degree murder during an assault by drive-by shooting,

18

and his mandatory life sentence without benefits of probation, parole, or suspension of sentence.

**AFFIRMED.**